961 So.2d 229 (2007)
Johnny WILLIAMSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1527.
Supreme Court of Florida.
May 10, 2007.
Rehearing Denied July 16, 2007.
*230 Harry P. Brody and Jeffrey M. Hazen of Brody and Hazen, P.A., Tallahassee, FL, for Appellant.
Bill McCollum, Attorney General, Meredith Charbula and Charmaine M. Millsaps, Assistant Attorneys General, Tallahassee, FL, for Appellee.
PER CURIAM.
Johnny Williamson appeals the denial of his successive motion for postconviction relief. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Williamson was sentenced to death for the 1985 prison murder of Daniel Drew. See Williamson v. State, 511 So.2d 289 (Fla.1987). In his motion, Williamson asserted that newly discovered evidence that could be used to impeach two inmates who testified against him at trial probably would have produced an acquittal or a sentence other than death if presented at trial. Because we conclude that none of the alleged newly discovered evidence would have affected the guilt-phase verdict or the decision to impose the death penalty, we affirm the denial of relief.

FACTS AND PROCEDURAL HISTORY
Williamson's claim centers on impeachment evidence concerning the testimony of Kenneth Baez and Omer Williamson (hereinafter referred to as Omer). In his motion, Williamson relied on an affidavit by Rigoberto Sanchez-Velasco, who was executed in 2002, and a motion for postconviction *231 relief seeking to withdraw his plea filed by Omer in 1993. Sanchez-Velasco was a prison inmate and Omer was Williamson's codefendant, who testified against Williamson pursuant to a plea agreement with the State. The facts as related in this Court's opinion in the direct appeal focused on Omer's testimony:
According to Omer Williamson's testimony, Omer owed Drew $15 in connection with a marijuana sale. Omer decided not to pay Drew because Omer believed Drew had been lying to him. When Omer told the appellant that he did not intend to repay Drew, Williamson said that they would have to kill Drew because Drew was "a country boy" who would stab Omer if he didn't pay his debt. "Chickenhead" Robertson, another inmate at the facility and co-defendant in Williamson's trial, learned of the plan to kill Drew and offered to look for a knife. When Robertson and Williamson were unable to find a knife, Omer went to his cell and got a metal rod from the sink which Drew had previously sharpened to a point. While Robertson acted as a lookout, Williamson and Omer went to the maintenance shop building where Drew was working. Williamson asked an inmate working at the shop to send Drew outside. When Drew came out Omer stood behind him, while Williamson gave him $5 so that it would look like they had given Drew less than Omer owed him and he had gotten upset and pulled a knife on them. Williamson then told Drew that Omer was having trouble getting the rest of the money and needed a knife to collect. Drew had apparently made a knife for Williamson and gave it to him at that point in the conversation. On Williamson's signal, Omer grabbed Drew by the throat from behind. Williamson stabbed Drew and a struggle ensued, with Omer throwing Drew to the ground, kicking him in the head several times. Williamson continued to stab Drew with the knife. When Omer became "grossed out" he gave Williamson the rod and left. Williamson then straddled Drew stabbing him repeatedly with the knife and metal rod. . . .
. . . Omer pled guilty to first-degree murder and agreed to testify against Williamson and Robertson in return for the state's agreement not to seek the death penalty. . . . Williamson, who did not testify during the guilt phase of the trial but did testify during the penalty phase, was found guilty of [first-degree murder]. Following the jury's recommendation of death, the trial court imposed the death penalty, finding three aggravating circumstances: 1) the capital felony was committed while Williamson was under a sentence of imprisonment; 2) Williamson had been previously convicted of a violent felony; and 3) the murder was committed in a cold, calculated and premeditated manner without a pretense of moral or legal justification. The trial court found no mitigating circumstances.
Williamson, 511 So.2d at 290-91.
Baez was one of several inmate witnesses called to testify in the State's case. He testified on direct examination that Williamson asked him for a shank before lunchtime on the day Drew was killed and said he wanted "to kill the son of a bitch." After Baez was cross-examined about inconsistent deposition testimony, he stated on redirect that Omer asked him about a knife on the afternoon of the murder. Baez said he changed his testimony from the grand jury proceeding to the deposition in an effort to keep from being called to testify at trial.
*232 Another inmate, Stephen Bishop, also testified that on the day of the killing, Williamson and Robertson asked where they could get a knife. Inmate Melvin Harris testified that Williamson, who was with Robertson and Omer, asked Harris to send Drew out of the maintenance building to speak with Williamson just before the killing. Harris testified that he then looked through a window and saw Omer hit Drew and Williamson stab Drew. Similarly, inmate Ronnie Presley saw Omer hold Drew and Williamson appear to hit him, then saw Williamson covered in blood. Presley also testified that Williamson said, "I wanted to get away with this, but there ain't no way that I can now," and that the "son of a bitch wouldn't die." Presley testified that he helped Williamson dispose of the bloody clothes and that Robertson helped him hide a knife.
After the murder, a correctional officer found Williamson in his cell wearing pants but no shirt or shoes. The shoes Williamson subsequently identified as his appeared to have bloodstains. Boxer shorts, socks, and a T-shirt found in his laundry bag also appeared to have blood on them. Some of the blood on one of the socks was identified as Type O, Drew's blood type.
This Court affirmed Williamson's first-degree murder conviction and sentence of death. Williamson, 511 So.2d at 290. We rejected a claim that the trial court erred in denying a mistrial when the prosecutor asserted in the guilt-phase rebuttal closing argument that Omer's plea to first-degree murder showed that the killing was premeditated. The Court concluded that the statement was a fair comment on the evidence and a permissible rebuttal to the defense's closing argument. Id. at 291-92. The Court also determined that the trial court did not err in sentencing Williamson to death but Omer to life imprisonment. The Court concluded that both the judge and the jury were aware of Omer's plea and probable life sentence and could have concluded from the evidence that Williamson was the dominant actor in the murder. "There was testimony that Williamson first suggested the killing, that he formulated the plan and recruited Robertson as the lookout, and that he was the one who repeatedly stabbed Drew." Id. at 292-93.
The Court subsequently affirmed the denial of Williamson's first motion for postconviction relief and denied his petition for a writ of habeas corpus. Williamson v. Dugger, 651 So.2d 84 (Fla.1994). An issue pertinent to the current appeal was whether the trial court erred in summarily denying a newly discovered evidence claim based on affidavits of two prisoners in Alabama, where Omer was eventually transferred for his safety after testifying in this case. The affidavits claimed that Omer said he "lied to the Florida authorities so that he could avoid the electric chair." Id. at 88. The Court concluded that the affidavits would probably not produce an acquittal on retrial because (1) the affidavits constituted impeachment evidence at best and Omer had already been substantially impeached at trial, including by a witness who heard Omer say he intended to "fix [Williamson's] ass," (2) the affidavits did not "set forth in what particular way Omer lied," and (3) the affidavits were largely consistent with the State's case against Williamson. Id. at 89.
Williamson next filed a petition for a writ of habeas corpus in federal district court, the denial of which was affirmed by the United States Court of Appeals for the Eleventh Circuit. See Williamson v. Moore, 221 F.3d 1177 (11th Cir.2000). The Eleventh Circuit wrote on two of nine issues raised by Williamson. First, the court concluded that trial counsel was not ineffective for failing to investigate and present a claim of self-defense, failing to *233 challenge the State's case on premeditation, or failing to cross-examine witnesses adequately. Id. at 1180-82. Second, the court concluded that the prosecutor did not commit a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in failing to turn over written notations of the prosecutor's mental impressions of the case and nonverbatim, nonadopted witness statements taken by the prosecutor. Id. at 1182-83.
In 1997, Williamson filed a successive motion for postconviction relief based on an affidavit by Rigoberto Sanchez-Velasco containing alleged newly discovered evidence regarding trial witnesses Baez and Omer. In the affidavit, Sanchez-Velasco swore to the following: (1) two to three days before the killing, Omer and Drew argued about money; (2) on the day of the murder, Sanchez-Velasco and Baez, both Hispanics, were playing poker from 9 a.m. to 3 p.m., and neither Omer nor Williamson approached Baez and asked for a knife; (3) after Sanchez-Velasco heard about the killing, he asked Omer for money Omer owed him but Omer, who had blood on his clothes, said he "fucked up" and did not have anything for Sanchez-Velasco; (4) after the killing, Baez said that prison authorities were offering money and transfers closer to home for prisoners who would testify against Williamson and were telling the prisoners what to say in their testimony; and (5) subsequently, Baez had $100 in his prison account and was transferred to South Florida.
Williamson supplemented the motion in 2003 with a claim based on Omer's motion for postconviction relief that was filed in 1993.[1] In the 1993 motion, Omer sought to withdraw his plea of guilty with respect to Drew's murder on the grounds that it was coerced. The trial court granted Williamson an evidentiary hearing only on issues raised by Omer's motion. The trial court denied an evidentiary hearing on issues raised in the Sanchez-Velasco claim after the prosecutor stated during the Huff hearing[2] that Sanchez-Velasco refused to testify in a deposition that was authorized to perpetuate his testimony and taken one day before his execution.
Omer and his trial counsel, Baya Harrison, testified during the 2004 evidentiary hearing on Williamson's motion. Following the hearing, the trial court entered an order denying Williamson's motion for postconviction relief. The court found the claims regarding both the Sanchez-Velasco affidavit and Omer's postconviction motion untimely. The court further addressed the merits and found that the Sanchez-Velasco affidavit contained inadmissible hearsay and that Omer's testimony during the evidentiary hearing failed to support the claim that Omer's trial testimony would be so discredited that Williamson would probably be acquitted on retrial.

ANALYSIS
Although the trial court concluded that the claims in Williamson's motion were untimely and without merit, we address only the determination that the alleged newly discovered evidence would not have changed the outcome of the trial or penalty phase. In the analysis that follows, we discuss the probability of acquittal on each of the two claims, and then address the probability of a lesser sentence and the claim of cumulative error.

*234 I. PROBABILITY OF ACQUITTAL
To warrant a new trial, "newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 709 So.2d 512, 521 (Fla.1998). Newly discovered evidence meets this standard if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla. 1996)). In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible." Id. at 521 (quoting Jones v. State, 591 So.2d 911, 916 (Fla.1991)). The assessment also considers
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Id. (citations omitted).
In this case, the trial court summarily denied one of the claims now on appeal and denied the other claim after an evidentiary hearing. Because different standards of review apply to our review of these rulings, we address each claim separately.

A. Sanchez-Velasco Affidavit
The trial court denied the Sanchez-Velasco claim without an evidentiary hearing because it rests entirely on an affidavit containing inadmissible hearsay. In the affidavit, Sanchez-Velasco stated that Omer and Drew argued about money several days before the killing and that Omer stated immediately after the murder that he had "fucked up." The affidavit further reflects that Sanchez-Velasco spent the entire day of the murder playing cards with Baez and that neither Williamson nor Omer approached Baez and asked him for a knife. The affidavit also contains Baez's statements that prison officials offered and gave him rewards in exchange for testifying against Williamson and told him what to say in his testimony. In the order denying relief, the trial court stated that it authorized a deposition to perpetuate Sanchez-Velasco's testimony before he was executed on October 2, 2002, but Sanchez-Velasco declined to testify. The court concluded that "[a]lleged newly discovered evidence that would not be admissible at trial is not `evidence' and cannot `be of such nature that it would probably produce an acquittal on retrial.'"
Florida Rule of Criminal Procedure 3.851(f)(5)(B) permits denial of a successive motion for postconviction relief without an evidentiary hearing "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." As noted above, a trial court ruling on a newly discovered evidence claim must "consider all newly discovered evidence which would be admissible." Jones, 709 So.2d at 521. The Sanchez-Velasco affidavit would not be admissible during a retrial because it does not meet any of the criteria for admission of a prior statement by an unavailable witness under section 90.804, Florida Statutes (2006). In Randolph v. State, 853 So.2d 1051 (Fla.2003), this Court affirmed the exclusion from a postconviction evidentiary hearing of an affidavit by a witness who died before the hearing. In concluding that the trial court did not abuse its discretion, we noted that the affidavit fell outside the four hearsay exceptions for a statement by an unavailable declarant: (1) former testimony; (2) statement under belief of impending death; (3) statement against interest; and (4) statement of family or personal history. *235 Id. at 1062; see also Lightbourne v. State, 644 So.2d 54, 56-57 (Fla.1994) (concluding that affidavits and letter from inmates unavailable to testify in postconviction hearing constituted inadmissible hearsay). Likewise, the contents of the Sanchez-Velasco affidavit are inadmissible hearsay by an unavailable declarant.
Williamson asserts that Baez's statement to Sanchez-Velasco that neither Williamson nor Omer approached Baez and asked for a knife on the day of the killing, that he was offered inducements to testify, and that he was told what to say during his testimony could all be used to impeach Baez in a retrial. The trial court did not address the use of the affidavit for impeachment, however, and Williamson does not explain how it could be used to impeach Baez under the rules of evidence.
In theory, the Sanchez-Velasco affidavit could be introduced under section 90.608, Florida Statutes (2006), to impeach Baez through prior inconsistent statements (assuming he would deny that he was given money and a transfer in exchange for testifying and told what to say) and to show his bias in favor of the State.[3]See Breedlove v. State, 413 So.2d 1, 6 (Fla.1982) ("Merely because a statement is not admissible for one purpose does not mean it is inadmissible for another purpose."); Dias v. State, 812 So.2d 487, 495 (Fla. 4th DCA 2002) ("A statement inadmissible as hearsay can still be admissible for another reason, such as for impeachment purposes."). However, even assuming the admissibility for impeachment purposes of the hearsay (by Sanchez-Velasco) and double hearsay (by Omer and Baez via Sanchez-Velasco) contained in the affidavit, its effect would have been negligible given Sanchez-Velasco's refusal to testify, the substantial impeachment of Baez at trial through prior inconsistent statements, and the other evidence against Williamson.
Finally, the argument between Omer and Drew about money overheard by Sanchez-Velasco and Omer's statement after the killing that he had "fucked up" and had no money to pay Sanchez-Velasco would not have impeached Omer's trial testimony. The evidence at trial already reflected that the killing was prompted by a money dispute between Omer and Drew. Omer admitted at trial that he had decided not to pay Drew a $15 debt. Williamson suggested killing Drew because he thought Drew would stab Omer if Omer confronted Drew without a weapon. Therefore, the information in the Sanchez-Velasco affidavit would have been merely cumulative on the financial motive for the killing.
In sum, the Sanchez-Velasco affidavit would be inadmissible during a retrial as substantive evidence, would have little effect on Williamson's premeditation if admitted to impeach Baez, and would have been cumulative if admitted to impeach Omer. Thus, the motion, files, and record conclusively show that the affidavit is not such that it would probably produce an acquittal or conviction of a lesser included offense on retrial.

B. Omer Williamson's Motion and Testimony
In a sworn postconviction motion filed in 1993, Omer asserted that he was coerced into pleading guilty to first-degree murder and testifying against Williamson. He claimed that his attorney negotiated the plea without his knowledge and that he was given five minutes to decide whether *236 to accept the plea. Omer claimed he was told that if he did not sign the plea agreement, the State "would sentence him to death that day" and could not protect him from his codefendants. Omer also claimed that although he held Drew while Williamson stabbed the victim, he did so because he feared Williamson and did not "agree of his own free will to participate, plan, or commit the act of murder." Omer testified that he did not pursue the motion and the record reflects it was denied in 1994 on several grounds, including that it was not timely filed. In his testimony during the evidentiary hearing, Omer reaffirmed his allegations of the coercive circumstances of the plea, except that he said he was never told he would not be protected from his codefendants. However, he stated that he agreed to tell the truth about the killing, including that he and Williamson had a plan to kill Drew that included a prearranged signal. Omer testified that he would have continued to pursue the motion if he thought it would help him, even though it contained falsehoods. This led to the following exchange:
Q. All right. Sometimes the truth can be twisted according to how much you have to gain from what you're saying.
A. I understand what you're saying, yes.
Q. Is that fair to say, I mean?
A. Yes.
Baya Harrison, Omer's trial counsel, testified that Omer instructed him to negotiate a plea that would enable him to avoid the death penalty. Harrison said he was trying to beat Williamson's counsel to the prosecutor's office to make a deal. Harrison denied Omer's assertions that he encouraged Omer to lie under oath at Williamson's trial and that the state attorney had indicated he was the person to make the decision whether Omer received the death penalty.
The trial court concluded that "[t]he testimony presented at the evidentiary hearing fails to support the claim that Omer's trial testimony is now so discredited that [Williamson] probably would be acquitted on a retrial." The court also found Omer's testimony at the evidentiary hearing that "there was a plan to murder Drew, and that, notwithstanding his earlier denial, he had willingly participated in that plan" to be "credible and persuasive."
When the trial court rules on a newly discovered evidence claim after an evidentiary hearing, this Court reviews the court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998) (citing Blanco v. State, 702 So.2d 1250, 1251 (Fla.1997)). As with rulings on other postconviction claims, this Court reviews the trial court's application of the law to the facts de novo. See Hendrix v. State, 908 So.2d 412, 423 (Fla.2005) (reviewing de novo the trial court's application of the law to the facts in ruling on a postconviction claim that the government withheld material evidence); Gore v. State, 846 So.2d 461, 468 (Fla. 2003) (reviewing de novo the application of the law to the facts on a claim of ineffective assistance of trial counsel); Demps v. State, 761 So.2d 302, 306 (Fla.2000) (reviewing de novo the denial of a claim that newly discovered evidence of an internal prison memo reflecting that the victim named a different inmate as the assailant rendered death sentence disproportionate in light of the life sentences imposed on codefendants).
Although Omer, in his postconviction motion, recanted his trial testimony that he willingly participated in a plan to commit the murder, he retracted the recantation during the evidentiary hearing. *237 The trial court determined that Omer was "credible and persuasive" during the evidentiary hearing when he reaffirmed that he and Williamson planned Drew's murder. "This Court does not substitute its judgment for that of the trial court on issues of fact when competent, substantial evidence supports the circuit court's factual findings or on issues of witness credibility." Smith v. State, 931 So.2d 790, 803 (Fla.2006) (citing Windom v. State, 886 So.2d 915, 921 (Fla.2004)). Accordingly, we defer to the trial court's findings crediting Omer's hearing testimony.
Further, the trial court did not err as a matter of law in rejecting the assertion that Omer's trial testimony would be so discredited by the new evidence that Williamson would probably be acquitted in a retrial. The motion and evidentiary hearing testimony would constitute negligible impeachment at best. It was clear from the cross-examination that in agreeing to testify against Williamson and Robertson, the third codefendant, Omer avoided exposure to the death penalty. In addition, Omer admitted during trial that he had eighteen prior felony convictions and acknowledged he had lied to Williamson in stating that he was in prison for second-degree murder rather than sexual abuse of a child. The thrust of the new evidence, that Omer could lie to serve his own interest and had lied in his postconviction motion, would not be a revelation to jurors on retrial.
Under similar circumstances, this Court affirmed the denial of a new trial in Brown v. State, 381 So.2d 690, 693 (Fla.1980). In that case, we agreed with the trial court "that a witness's post trial recantation of testimony, followed by a clear retraction of the post trial statements, is not sufficient to overturn a jury verdict and sentence." Id.; cf. Duckett v. State, 918 So.2d 224, 233 (Fla.2005) (concluding that, in light of witness's refusal to testify at evidentiary hearing following recantation in post-trial interviews, "it appears that she would not testify to anything new at a new trial" and therefore the purported change in testimony would be unlikely to result in a new trial), cert. denied, ___ U.S. ___, 127 S.Ct. 103, 166 L.Ed.2d 78 (2006). As in Brown, the impeachment from Omer's sworn motion and postconviction hearing testimony is not such that it would probably result in an acquittal of Williamson for first-degree murder.

II. PROBABILITY OF A LIFE SENTENCE
In order to grant a new penalty phase based on newly discovered evidence, the newly discovered evidence must be of such a nature that it would probably result in a life sentence. Rutherford v. State, 926 So.2d 1100, 1108 (Fla.2006). Williamson asserts that even if the newly discovered evidence would not create a likelihood of acquittal in a retrial, the Sanchez-Velasco affidavit and Omer's postconviction motion and evidentiary hearing testimony would be admissible in the penalty phase to create residual doubt of guilt and negate the heightened premeditation necessary for the "cold, calculated, and premeditated" (CCP) aggravating factor found by the trial court. We conclude that under both the standard of review applied to summary denials and the standard of review applied to denials after an evidentiary hearing, this claim is also without merit.
This Court has held that "residual or lingering doubt . . . is not an appropriate matter to be raised in mitigation during the penalty phase proceedings of a capital case." Rose v. State, 675 So.2d 567, 572 n. 5 (Fla.1996); see also Reynolds v. State, 934 So.2d 1128, 1152 (Fla.2006) (concluding that the trial court "appropriately excluded evidence offered to establish residual or *238 lingering doubt from consideration when making its sentencing determination"). Further, although section 921.141(1), Florida Statutes (2006), "`relaxes the evidentiary rules during the penalty phase of a capital trial' a party cannot introduce hear-say evidence unless the opposing party has a fair opportunity to rebut the hearsay." Parker v. State, 873 So.2d 270, 282 (Fla. 2004) (quoting Blackwood v. State, 777 So.2d 399, 411 (Fla.2000)). In Parker, this Court affirmed a trial court's decision to exclude contents of an affidavit by a deceased victim that were not admissible under section 90.804, Florida Statutes, on grounds that "the State had no fair opportunity to rebut because the State could not question the victim." Id. The Sanchez-Velasco affidavit would be excludable from a new penalty phase under the same rationale.
Even if we assume that the Sanchez-Velasco affidavit and Omer's motion and evidentiary hearing testimony would be admissible during a new penalty phase, it is unlikely that this evidence would rebut evidence of the CCP aggravator. In the sentencing order, the trial court explained its finding that the murder was CCPone of three aggravators, with no mitigation as follows:
The Defendant had not even a pretense of justification for murdering the decedent. The Defendant testified on his own behalf at the sentencing phase and admitted stabbing the decedent multiple times. The evidence was conclusive that the Defendant was the primary leader in planning the murder, securing a weapon, and personally committing the murderous act. Although he denied having the brass rod, the evidence is clear that he took it with him for the sole purpose of committing the murder. After the murder, the Defendant meticulously sought to conceal evidence and impede the investigation. The "cold" manner of the murder was further evidenced by the Defendant's statements in effect reflecting that he was disappointed that it took so much effort to kill the decedent. Later statements to Omer James Williamson, reflected that the Defendant was very aware that the State needed sufficient evidence of premeditation in order to convict for first degree murder, and that an absence of the weapons available to the prosecution as evidence, particularly the brass rod, would be helpful to his case.
The pathologist testified that the body of the decedent contained several marks made by a blunt instrument, which supported the testimony of Omer James Williamson that the Defendant had unsuccessfully tried to stab the [decedent] with the brass rod.
In summary, the Defendant committed a murder for no reason at all; his only explanation suggested that he didn't know why he had done it. But it is unequivocally clear that he planned the murder and executed it with precision, according to the plan. This murder is best put in proper perspective, by the observation that this homicide so offended even the inmates at Cross City Correctional Institution, that several broke the "code of silence," testified for the State at the trial concerning what they had witnessed, and thereby risked their own personal safety thereafter in the prison system.
The nature of the cumulative and negligible impeachment of Baez and Omer regarding Williamson's premeditation and Omer's motivation for the killing is not such that it probably would have produced a life sentence. See Rutherford, 926 So.2d at 1108.

III. CUMULATIVE EFFECT
Williamson urges us to consider the evidence presented in his successive postconviction *239 motion and the evidentiary hearing in tandem with evidence presented in prior postconviction proceedings. Our precedent supports cumulative consideration of all admissible newly discovered evidence. See Lightbourne v. State, 841 So.2d 431, 436 (Fla.2003); Jones, 709 So.2d at 522. Williamson specifically relies on affidavits presented in his previous postconviction motion from two Alabama inmates who claimed that Omer told them that he lied during Williamson's trial to avoid the electric chair. See Williamson, 651 So.2d at 89. This Court affirmed the denial of relief based on these affidavits partially because Omer was substantially impeached at trial, rendering the affidavits "cumulative in nature." Id.
These affidavits add nothing concerning Baez and little to the impeachment of Omer. In fact, the affidavits' assertion that Omer admitted lying in Williamson's trial is weakened by Omer's reaffirmation, during the postconviction evidentiary hearing, of his trial testimony that he and Williamson planned Drew's murder and his retraction of his assertion to the contrary in his postconviction motion.
Williamson also weaves the prosecutor's trial preparation notes into his cumulative error argument. These notes were the subject of claims under Brady and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), presented in Williamson's first postconviction motion and appeal. See Williamson, 651 So.2d at 88. The Court concluded that the notes were not discoverable under Florida Rule of Criminal Procedure 3.220. Id.; see also Fla. R.Crim. P. 3.220(g)(1) (precluding discovery of attorney work product). As the Eleventh Circuit noted in addressing the same claim, these documents, which include nonverbatim and nonadopted notes of witness interviews, impressions of witness remarks, and discussions of trial strategy, are not admissible. See Williamson, 221 F.3d at 1183. Accordingly, they are not properly part of an analysis of the cumulative effect of all admissible evidence in a newly discovered evidence claim.
For these reasons, Williamson's cumulative error argument is without merit.

CONCLUSION
Williamson has not established that his alleged newly discovered evidence probably would have changed the outcome of the guilt or penalty phases of his trial, either alone or in tandem with evidence presented in previous postconviction proceedings. Accordingly, we affirm the trial court's denial of Williamson's successive motion for postconviction relief.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Williamson also filed a supplemental claim based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He does not appeal the trial court's denial of his Ring claim.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] Because Sanchez-Velasco died without perpetuating his testimony, impeachment pursuant to section 90.608(5) through "[p]roof by other witnesses that material facts are not as testified to by the witness being impeached,"whether Williamson approached Baez for a knifewould be unavailable.