# Third District Court of Appeal

## State of Florida

Opinion filed April 12, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-1111
Lower Tribunal No. F01-8287D
_____

**John J. Connolly, Jr.,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An appeal from the Circuit Court for Miami-Dade County, Nushin G. Sayfie, Judge.

Miami Law Innocence Clinic, Craig J. Trocino, James E. McDonald, P.A., and James E. McDonald, for appellant.

Ashley Moody, Attorney General, Michael W. Mervine, and Linda Katz, Assistant Attorneys General, for appellee.

Before EMAS, HENDON, and MILLER, JJ.

MILLER, J.

Appellant, John Joseph Connolly, Jr., a former Federal Bureau of Investigation ("FBI") agent, challenges the post-evidentiary hearing denial of his motion for postconviction relief alleging, among other grounds, that appellee, the State of Florida, violated his due process rights by failing to disclose exculpatory evidence as required by the watershed United States Supreme Court decision, Brady v. Maryland, 373 U.S. 83 (1963). Because Connolly failed to establish a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," United States v. Bagley, 473 U.S. 667, 682 (1985), we affirm.[1]

**BACKGROUND**

This case traces its origins to a decades-long effort by the FBI to infiltrate the La Cosa Nostra, an organized crime syndicate responsible for a myriad of murders in the Boston area. In 1968, Connolly joined the FBI and was soon tasked with cultivating certain government informants, including James J. "Whitey" Bulger and Stephen "the Rifleman" Flemmi, two notorious members of a rival criminal organization, the Winter Hill Gang. Connolly and his immediate supervisor, John Morris, developed close relationships with

---

[1] We summarily affirm the remaining grounds. See State v. Connelly, 748 So. 2d 248, 252–53 (Fla. 1999) (concluding that verdicts were not truly inconsistent where inconsistency could have been the result of jury lenity, "and, therefore, verdicts do not always speak to the guilt or innocence of a defendant").

Bulger and Flemmi. Both FBI agents were eventually corrupted, and Connolly purportedly divulged confidential information to Bulger and Flemmi that led to the slaying of a prospective informant, John Callahan, the president of World Jai-Alai, at the hands of a Bulger hitman, John Martorano, in 1982.

Years later, Connolly was indicted for first-degree murder in Miami-Dade County. The case proceeded to a multi-month jury trial. The facts adduced at trial are set forth in this court's earlier opinion in Connolly v. State, 172 So. 3d 893 (Fla. 3d DCA 2015). As salient here:

> In 1973, the defendant . . . was transferred to the Boston office of the FBI where he was assigned to the organized crime division. In 1975, the defendant recruited Bulger and Flemmi to work as FBI informants, and over time, the defendant became corrupted by his relationship with Bulger, Flemmi, and the Winter Hill Gang. Although he provided some of the information he obtained from Bulger and Flemmi to the FBI, the defendant also submitted false and misleading information and reports to the FBI to protect Bulger and Flemmi, and he provided Bulger and Flemmi with confidential FBI and law enforcement information, which enabled Bulger and Flemmi to avoid arrest and prosecution by federal, state, and local law enforcement.
>
> Flemmi testified that the defendant was considered a member of their criminal organization and that he was essentially on their payroll. In exchange for the defendant's services (providing misleading and false information to the FBI and giving Bulger and Flemmi confidential law enforcement information), the defendant was paid large sums of money. Bulger and Flemmi also used the defendant as a conduit for the delivery of cash and gifts from Bulger and Flemmi to other FBI agents. Thus, the defendant was working both sides and profiting from each. He benefited

3

professionally by providing organized crime information to the FBI, and he benefited personally and financially by assisting Bulger and Flemmi.

The jury learned about some of the confidential information the defendant provided to Bulger and Flemmi. For example, in 1976, the defendant warned Bulger and Flemmi that Richard Castucci, another FBI confidential informant, had given the FBI the location of two Winter Hill Gang members who were federal fugitives. Based on the information provided to them by the defendant, Bulger and Flemmi warned the two fugitives, and they, along with Martorano, murdered Castucci for his disclosures to the FBI. In 1978, the defendant also warned Bulger and Flemmi that they were about to be indicted in a federal racketeering case, but the defendant told them that if they agreed not to kill Anthony "Tony" Ciulla, who was cooperating with the government as a witness against members of their criminal organization, Bulger and Flemmi would not be indicted. Additionally, the defendant warned Bulger and Flemmi that Martorano was going to be indicted. As a result, Martorano went into hiding in Miami.

In 1978, Callahan, the victim in the instant case, was the owner and president of World Jai Alai. When Callahan learned that the authorities in Connecticut had discovered his ties to the Winter Hill Gang and other organized crime figures in Boston, he sold World Jai Alai to Roger Wheeler ("Wheeler"). Four years later, when Callahan decided that he wanted to repurchase World Jai Alai from Wheeler, but Wheeler refused to sell, Callahan solicited Bulger, Flemmi, and Martorano to murder Wheeler. On May 27, 1981, Martorano shot and killed Wheeler at a country club in Tulsa, Oklahoma.

During its investigation of the Wheeler murder, the FBI began searching for members of the Winter Hill Gang to cooperate with the FBI. Brian Halloran ("Halloran"), a member of the Winter Hill Gang who had been indicted for an unrelated murder in Boston, agreed to cooperate with the FBI in the Wheeler murder investigation in order to obtain leniency in his pending case.

4

When the defendant learned from his supervisor, Special Agent John Morris, that Halloran was cooperating with the FBI and that Halloran had implicated Bulger and Flemmi in the Wheeler murder, the defendant warned Bulger and Flemmi. After this initial warning, the defendant contacted Bulger and Flemmi again to warn them that the FBI had outfitted Halloran with a body wire and had directed Halloran to meet with Callahan. After being alerted by the defendant, Bulger and Flemmi warned Callahan that Halloran intended to inform on him, and Bulger, with the help of other Winter Hill Gang members, murdered Halloran.

Because the Halloran murder was committed on a public street in Boston, the investigation intensified. In an effort to deflect suspicion away from Bulger, Flemmi, and the Winter Hill Gang, the defendant prepared and submitted a series of false reports suggesting that other organized crime factions in Boston were responsible for Halloran's murder. Despite the defendant's efforts, the FBI continued to believe that Bulger and Flemmi were involved in the Wheeler and Halloran murders, and its investigation focused on locating Callahan to obtain his cooperation. When the defendant learned that the FBI was looking for Callahan, the defendant contacted Bulger and Flemmi and told them that Callahan would likely cooperate and implicate Bulger, Flemmi, and Martorano in the Wheeler murder, and the defendant suggested that they contact their hit man, Martorano, to "handle it" so none of them would be caught.

Thereafter, Bulger and Flemmi met with Martorano, informed him what the defendant had told them, and Martorano agreed to kill Callahan before the FBI could locate him, specifically agreeing to kill Callahan in Florida because of the "heat on them" in Boston. After meeting with Martorano, Bulger and Flemmi met with the defendant and told the defendant that Martorano and his associate, Joe MacDonald, were going to "take care of" Callahan. Flemmi testified that the defendant clearly knew that "tak[ing] care of" Callahan meant they were going to have Callahan killed based on the information the defendant had given them—that the FBI would find Callahan, who would likely cooperate with the FBI and implicate Bulger, Flemmi, and Martorano in Wheeler's murder. On July 31, 1982, Martorano

5

met Callahan at the Fort Lauderdale Airport, shot Callahan in the back of the head, put Callahan in the trunk of a car, and left the car and body at the Miami International Airport.

In anticipation of Callahan's murder, the defendant filed false reports with the FBI in an effort to mislead the FBI and to protect Bulger and Flemmi. In these reports, the defendant provided alibis for Flemmi and Bulger for both the Halloran murder and the planned Callahan murder, and the defendant also falsely reported that Callahan had a falling-out with a group of Cuban drug dealers in Miami in order to deflect the FBI's attention away from Flemmi, Bulger, and Martorano.

After Callahan was murdered, the FBI and other law enforcement agencies redoubled their efforts into the investigation, and the defendant continued to manipulate the system to protect Bulger, Flemmi, and himself. However, in 1990, after the defendant had retired from the FBI, Bulger and Flemmi became the subjects of a federal grand jury investigation. The defendant, who had maintained his relationship with other FBI agents, kept Bulger and Flemmi informed as to the progress being made in the FBI's investigation of Bulger and Flemmi, and, when the defendant learned Bulger and Flemmi were about to be indicted by the federal grand jury and arrested, he warned them. Bulger went into hiding, while Flemmi, who did not react quickly enough, was arrested.

After Flemmi was arrested, the defendant wrote a letter to the presiding federal judge in an effort to have Flemmi's case dismissed. Many of the statements he made in this letter were false. The defendant also provided sensitive FBI information and documents to Flemmi's defense attorney, and he counseled Flemmi to falsely testify that the defendant's supervisor, Special Agent Morris, warned Bulger about the federal indictment rather than the defendant.

Id. at 899–901 (alteration in original).

The jury found Connolly guilty of second-degree murder with a firearm, and he was sentenced to forty years in prison.[2] He then filed a direct appeal challenging the firearm reclassification applied to the second-degree murder conviction on numerous of grounds. See Connolly, 172 So. 3d at 898. This court affirmed his conviction and sentence in an en banc decision. Id. at 925–26. The Florida Supreme Court subsequently denied review, see Connolly v. State, No. SC15-1585, 2016 WL 224185 (Fla. Jan. 19, 2016), and a later petition for ineffective assistance of appellate counsel proved unsuccessful, see Connolly v. State, 288 So. 3d 638 (Fla. 3d DCA 2019).

In early 2017, while his petition for ineffective assistance of appellate counsel was pending, Connolly filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. In the motion, he alleged, among other grounds, that his attorneys were ineffective for failing to conduct an adequate investigation, and the State violated his due process rights by failing to disclose exculpatory evidence.

In support of his motion, Connolly appended a post-trial affidavit executed by one of the State's listed trial witnesses, former assistant agent-in-charge of the Boston FBI office, Robert Fitzpatrick. The affidavit, bearing

---

[2] Connolly has since been granted conditional medical release. See § 947.149, Fla. Stat. (2020).

7

a date of December 3, 2013, detailed a conversation Fitzpatrick purportedly had with James Marra, the lead investigator assigned to the Callahan murder, at some point between 2006 and 2008 outside of a Boston courtroom. Fitzpatrick attested he informed Marra that Connolly was sequestered from the Wheeler investigation because, during that time, he was pursuing a graduate degree at Harvard University. Fitzpatrick additionally asserted he believed Morris presented a viable alternative source for the leak.

Upon receiving the postconviction relief motion and accompanying affidavit, the State produced a previously undisclosed e-mail Marra forwarded to prosecutors in 2006. In the e-mail, Marra wrote:

> [Robert] Fitzpatrick voluntarily called me this afternoon. . . . Fitzpatrick . . . stated that it was his personal "opinion" that John Connolly was not responsible for the Halloran and Callahan murders. However, he offered no specific information to support his opinion and agreed that he was not privy to all the evidence in the Connolly murder prosecution case in Florida. Fitzpatrick added that he has no information that Connolly did or did not reveal FBI informant identities to Bulger/Flemmi.

The trial court convened an evidentiary hearing on the motion. Fitzpatrick was too ill to travel or testify. His testimony was never perpetuated, and he died shortly after the evidentiary hearing. Consequently, he never formally corroborated the contents of the affidavit.

8

Notwithstanding these facts, the defense introduced Fitzpatrick's affidavit into evidence over a hearsay objection by the State.

Both of Connolly's court-appointed attorneys testified extensively concerning their reasons for failing to conduct a deposition or call Fitzpatrick as a witness at Connolly's 2008 trial. They stated that they learned before trial the State did not intend to call Fitzpatrick. This decision was purportedly prompted by credibility concerns. Connolly was similarly wary of Fitzpatrick and concerned he would not offer favorable evidence because he was "unstable." Both attorneys indicated that, had they known of the e-mail, they would have reconsidered their decision.

Marra confirmed the contents of his e-mail and added that he met Fitzpatrick in 2006, in person, outside of a Boston courtroom. He denied having discussed the strength of the case at that time and instead testified that Fitzpatrick later telephoned him and called into doubt Connolly's guilt. Marra maintained that Fitzpatrick offered no evidence in support of his opinion.

The State introduced multiple exhibits designed to impeach the veracity of the statements contained within Fitzpatrick's affidavit. Heavily featured were transcripts from related prosecutions, FBI teletypes and

9

reports, and a myriad of published statements by Fitzpatrick implicating Connolly in criminal activity.

At the conclusion of the hearing, the trial court determined that the State deliberately and intentionally withheld the e-mail. It further found that, although the statement contained within the e-mail was favorable, it was not material, and therefore Connolly failed to establish a Brady violation. A motion for rehearing proved futile, and the instant appeal ensued.

## STANDARD OF REVIEW

We apply a mixed standard of review to the postconviction denial of a Brady claim following an evidentiary hearing. Bolin v. State, 184 So. 3d 492, 501 (Fla. 2015). We defer to factual findings that are supported by competent, substantial evidence and apply the law to those findings de novo. Id.

## ANALYSIS

### I.    *Brady* and its Progeny

In the landmark case of Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, the United States Supreme Court established the parameters of the prosecutorial obligation to furnish the defendant exculpatory evidence in a criminal case. The Court held in Brady that "suppression by the prosecution of evidence favorable to an accused upon request violates due process

10

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Court later confirmed that the duty to disclose such evidence exists even in the absence of a specific request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and extends to impeachment evidence, Bagley, 473 U.S. at 676.

The Brady rule encompasses evidence known only to law enforcement and not the prosecutor. See Kyles v. Whitley, 514 U.S. 419, 438 (1995). Consistent with this principle, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id. at 437.

The defendant bears the burden of establishing a Brady violation. Archer v. State, 934 So. 2d 1187, 1202 (Fla. 2006). In this regard, the defendant must establish three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

The definition of "favorable" in this context is not difficult to ascertain. Evidence that fortifies the defense's case or has impeachment value is favorable. See Allen v. State, 854 So. 2d 1255, 1259 (Fla. 2003).

11

Whether evidence has been suppressed by the State involves a slightly more nuanced analysis. The Florida Supreme Court has explained that "[t]here is no Brady violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." Floyd v. State, 18 So. 3d 432, 451 (Fla. 2009) (alteration in original) (quoting Provenzano v. State, 616 So. 2d 428, 430 (Fla. 1993)). And, "[e]qually available evidence is not suppressed where 'the defendant was aware of the exculpatory information.'" Owen v. State, 986 So. 2d 534, 547 (Fla. 2008) (quoting Way v. State, 760 So. 2d 903, 911 (Fla. 2000)). Accordingly, investigators and prosecutors are not required to affirmatively furnish a defendant with information he already has or can obtain with any reasonable diligence. See 15 Fla. Jur. 2d Criminal Law—Procedure § 1544 (2022) ("The prosecution's disclosure obligations principally concern those matters not accessible to the defense in the course of reasonably diligent preparation.").

Under Brady, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. "A reasonable probability does not mean that the defendant 'would more likely

than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" Smith v. Cain, 565 U.S. 73, 75–76 (2012) (alteration in original) (quoting Kyles, 514 U.S. at 434). The court must consider the cumulative effect of the suppressed evidence. Cardona v. State, 826 So. 2d 968, 973 (Fla. 2002). Thus, "[e]ven where favorable evidence is suppressed, a new trial will not be necessary where it is determined that the favorable evidence did not result in prejudice." Duckett v. State, 918 So. 2d 224, 235 (Fla. 2005) (quoting Wright v. State, 857 So. 2d 861, 870 (Fla. 2003)).

## II.    Fitzpatrick's Affidavit

Against this judicial landscape, we examine the instant case. As a threshold matter, the State contends that because Fitzpatrick did not testify at the evidentiary hearing, his affidavit constitutes inadmissible hearsay and should not factor into our analytical matrix. Relying upon Florida Supreme Court precedent, we agree and confine our review to whether the failure to disclose the statement Fitzpatrick made to Marra amounted to a violation under Brady and its progeny. See Williamson v. State, 961 So. 2d 229, 234–35 (Fla. 2007) (finding that affidavit of declarant unavailable to testify constituted inadmissible hearsay in postconviction evidentiary hearing);

13

Randolph v. State, 853 So. 2d 1051, 1062 (Fla. 2003) (affirming exclusion of affidavit by a witness who died before postconviction evidentiary hearing).

III.    **Fitzpatrick's Statement to Marra**

Throughout his testimony, Marra confirmed that Fitzpatrick merely communicated his conclusory opinion that Connolly was innocent. This type of opinion, untethered to any evidentiary support, has generally been condemned as inadmissible. See Roundtree v. State, 145 So. 3d 963, 965 (Fla. 4th DCA 2014) ("[A] witness's opinion as to the credibility, guilt or innocence of the accused is generally inadmissible . . . ."); Jackson v. State, 107 So. 3d 328, 330 (Fla. 2012) (finding reversible error where State introduced videotape of defendant's interrogation, in which officers repeatedly expressed their personal opinions about defendant's guilt); Martinez v. State, 761 So. 2d 1074, 1079 (Fla. 2000) ("We begin our analysis with the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible."); Dubon v. State, 295 So. 3d 259, 273 (Fla. 4th DCA 2020) (quoting Glendening v. State, 536 So. 2d 212, 221 (Fla. 1988)) ("[A]n opinion as to the guilt or innocence of an accused is not admissible."). Nonetheless, the statement, as confirmed within the e-mail, raises questions as to Connolly's culpability, satisfying the first element of

14

Brady.  As neither the e-mail nor the statement was disclosed by the State prior to trial, we must examine materiality.[3]

The State argues there is no record support for the finding below that the prosecutors deliberately and intentionally withheld the e-mail.  While this argument is persuasive, the critical inquiry in this context is not the degree of intentionality of the act.  Brady extends equally to both intentional and inadvertent suppressions.  See, e.g., Giglio v. United States, 405 U.S. 150, 153 (1972) (internal quotation marks omitted) ("[S]uppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution."); Way, 760 So. 2d at 912 (finding photographs of crime scene were nonetheless suppressed by State where it affirmatively represented all such photographs had been produced to defense and, in doing so, unintentionally caused defense to believe same).

The defense, in turn, contends that a deposition or interview would have led to the discovery of Fitzpatrick's exculpatory statement.  This argument is little more than a backdoor conduit for the otherwise inadmissible affidavit, and it fails substantively on the record before us.

_____

[3] Because Fitzpatrick was listed as a prosecution witness from the outset of the case, whatever information he relayed to Marra was available "through the exercise of reasonable diligence."  Floyd, 18 So. 3d at 451 (quoting Provenzano, 616 So. 2d at 430).

15

Marra was the sole witness to testify at the evidentiary hearing as to Fitzpatrick's opinion, and he did not deviate from the synopsis he provided to the prosecutors in the e-mail. The defense offered nothing to corroborate the affidavit-based contention that Connolly was insulated from the Wheeler investigation. And any such claim is clearly refuted by a holistic review of the evidence.

The record is littered with paperwork, including teletypes, memoranda, reports, and other internal documents, demonstrating that Connolly had access to the investigation and falsified documents to protect the informants and hinder the discovery of his own illegal acts. Moreover, the defense was, at a minimum, constructively aware of the dates Connolly attended Harvard, the confidentiality safeguards implemented by the FBI, and the structure of the agency. This type of imputed knowledge has been held sufficient to defeat similar Brady claims. See, e.g., Harris v. Kuba, 486 F.3d 1010, 1015 (7th Cir. 2007) (holding no Brady violation where evidence of plaintiff's alibi was not disclosed, because plaintiff was aware of his own whereabouts); Rector v. Johnson, 120 F.3d 551, 560 (5th Cir. 1997) (holding State's failure to disclose alibi witness statement did not constitute Brady violation because defendant, "better than anyone else, knew his whereabouts on the night of [the victim's] murder, and therefore his failure to discover the information

16

possessed by [the witness] was the result of a lack of diligence on his part");

United States v. Dawson, 425 F.3d 389, 393 (7th Cir. 2005) (finding taped conversations that defendants were part did not constitute Brady material "because the defendants, being parties to the conversation, were equally aware" of what was said); United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990) (holding government's failure to advise defendant in advance that witness would testify in his favor that he was not present at time of drug transaction was not a Brady violation because defendant was aware of essential facts of witness's testimony); United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) ("[I]nformation actually known by the defendant falls outside the ambit of the Brady rule."); Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) (finding no Brady violation where petitioner "possessed the salient facts regarding the existence of the records that he claims were withheld").

Similarly, to the extent the e-mail implicated Morris as an alternative culprit, the facts underlying this inference were universally known. On direct and cross-examination, Morris conceded he had superior control over the investigation due to his senior rank. He acknowledged he met with the informants on multiple occasions and admitted to having illegally accepted gifts and cash. He testified he was aware of the details of the Wheeler investigation, and he conceded he received immunity in exchange for

17

cooperation. Given this testimony, the information needed to develop the theory was available to the defense, and the e-mail offered nothing new. See, e.g., Spirko v. Mitchell, 368 F.3d 603, 611 (6th Cir. 2004) (finding State's failure to produce evidence of defendant's alleged accomplice's alibi did not constitute Brady violation because "the evidence was available to [defendant] from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence").

Lastly, the record before us is replete with irreconcilably contradictory statements rendered by Fitzpatrick in the years leading up to his death. To identify but a few examples, an internal report reflected that Fitzpatrick received a complaint that Connolly was "rifling" through a colleague's file on the Wheeler investigation at around the same time as the FBI developed the informants as suspects. Two years before he executed the affidavit, Fitzpatrick described Morris and Connolly as partners engaged in an "enterprise." In a 2012 book excerpt, Fitzpatrick stated that Connolly contemporaneously informed Bulger that the FBI was seeking Halloran's cooperation in the Wheeler investigation. Shortly before Connolly's trial, Fitzpatrick appeared on "60 Minutes," a weekly investigative news broadcast, and characterized Connolly as an "informant for Bulger." On yet another occasion, Fitzpatrick told the Boston Herald, one of Boston's two

18

major daily newspapers, that Connolly was chiefly responsible for a string of murders committed by Bulger and Flemmi. This evidence, particularly viewed as a whole, fortifies the reliability concerns articulated by both Connolly and the State prior to trial and negates any natural expectation that Fitzpatrick would have corroborated the contents of his affidavit before it was executed.

The foregoing factors, in conjunction with the inability to produce Fitzpatrick as a witness and the observation by Judge Rothenberg, writing for this court en banc, that "the evidence as to . . . [Connolly's] participation in [Callahan's] murder . . . [was] overwhelming," Connolly, 172 So. 3d at 898, yield the conclusion there is no "reasonable probability that, had the [e-mail] been disclosed to the defense, the result of the proceeding would have been different," Bagley, 473 U.S. at 682. Accordingly, we affirm the denial of postconviction relief.

Affirmed.