ON MOTION FOR REHEARING EN BANC

ROTHENBERG, J.
Based on the State of Florida’s (“the State”) motion for rehearing/rehearing en banc, we grant rehearing en banc, withdraw this Court’s opinion issued on May 28, 2014, and issue the following en banc opinion affirming John J. Connolly, Jr.’s (“the defendant”) conviction for second degree murder with a firearm in its stead.
As the State correctly noted in its opening statement at the en banc oral argument before this Court, and which is supported by the record:
John Connolly [was] not an innocent FBI Agent sitting at his desk a thousand miles away from the murder. John Connolly [was] the primary mover who started the murder in action. It was his phone call to Whitey Bulger telling him that the FBI [was] going to question — [was] looking for John Callahan — going to squeeze him — if they squeeze him he will talk, if he talks we will all go to jail. You gotta get Johnny Martorano and have him take care of him. That was the initial act which caused the death of the victim.... Defendant’s act as an aider and abettor, an accessory before the fact, became a crime once the crime was committed here in Florida.
The defendant and his co-defendants were charged with first degree premeditated murder (Count I) and conspiracy to *898 commit first degree murder (Count II). The defendant and co-defendants were tried separately, and the jury convicted the defendant of second degree murder with a firearm as a lesser included offense of first degree murder. The second degree murder conviction was reclassified from a first degree felony to a life felony pursuant to section 775.087(1), Florida Statutes (1981), based on the jury’s specific finding that the defendant was armed with a firearm during the acts giving rise to his liability for second degree murder.
The defendant does not dispute the sufficiency of the evidence relied on by the jury in finding him guilty of second degree murder, nor does he dispute that he carried a firearm on his person during the acts he committed as a principal to the murder. The evidence as to both his participation in the murder and his possession of a firearm during his participation is overwhelming. Rather, the defendant disputes the legality of the reclassification of the second degree murder from a first degree felony to a life felony even though the reclassification was based on his actual possession of a firearm. The reclassification issue is dispositive, as it is undisputed that the indictment was filed in 2005 and the homicide was committed in 1982. Thus, without the reclassification from a first degree felony to a life felony, the defendant’s conviction must be vacated due to the expiration of the four-year statute of limitations for first degree felonies pursuant tp the law that was in effect in 1982.[1] § 775.15(2)(a), Fla. Stat. (1981).
The defendant contends that the firearm reclassification was error because: (1) there was a defect in the charging document; (2) the jury verdict was insufficient to subject him to reclassification; (3) reclassification cannot be based on a co-defendant’s use of a firearm during the commission of the offense; and (4) there was no evidence that the defendant carried a firearm during the commission of the murder.
As will be detailed herein: (1) the defendant failed to raise an objection to any defect in the charging document and therefore waived his objection to the indictment, and no fundamental error has been demonstrated;. (2) his argument regarding the verdict form was also not raised and therefore waived, and it is completely without merit; (3) reclassification of the second degree murder was based on the defendant’s personal possession of a firearm during the commission of the homicide, not on the vicarious possession of a firearm by a co-defendant; and (4) there was abundant evidence that the defendant personally carried a firearm during the commission of the homicide.

SUMMARY OF THE CASE

The 2005 indictment charged the defendant and his co-defendants in Count I as follows:
Count I
[T]hat on or between the 31st day of July, 1982, and the 2nd day of August, 1982, within the Counties of Miami-Dade and Broward, State of Florida, JAMES J. BULGER, STEPHEN J. FLEMMI, JOHN V. MARTORANO and JOHN J. CONNOLLY, JR., did unlawfully and feloniously kill a human being, to wit: JOHN B. CALLAHAN, from a premeditated design to effect the death of the person killed or any human being, by shooting the said JOHN-B. CALLAHAN with a firearm, in violation of s. 782.04(1), s. 775.087 and s. 777.011, Florida Statutes, to the evil example of *899 all others in like cases offending and against the peace and dignity of the State of Florida.
To understand the murder of John B. Callahan (“Callahan”) and the defendant’s involvement in Callahan’s murder, a summary of the evidence established at trial is necessary. The evidence at trial revealed that Callahan’s murder was the last of several murders committed by and/or for the benefit of James “Whitey” Bulger, Stephen Flemmi, John Martorano, and the Winter Hill Gang, an organized crime organization working out of Boston, Massachusetts. The chain of events that led to Callahan’s murder began in 1978.
In 1973, the defendant, an agent working for the Federal Bureau of Investigation (“FBI”), was transferred to the Boston office of the FBI where he, was assigned to the organized crime division. In 1975, the defendant recruited Bulger and Flemmi to work as FBI informants, and over time, the defendant became corrupted by his relationship with Bulger, Flemmi, and the Winter Hill Gang. Although he provided some of the information he obtained from Bul-ger and Flemmi to the FBI, the defendant also submitted false and misleading information and reports to the FBI to protect Bulger and Flemmi, and he provided Bulger and Flemmi with confidential FBI and law enforcement information, which enabled Bulger and Flemmi to avoid arrest and prosecution by federal, state, and local law enforcement.
Flemmi testified that the defendant was considered a member of their criminal organization and that he was essentially on their payroll. In exchange for the defendant’s services (providing misleading and false information to the FBI and giving Bulger and Flemmi confidential law enforcement information), the defendant was paid large sums of money. Bulger and Flemmi also used the defendant as a conduit for the delivery of cash and gifts from Bulger and Flemmi to other FBI agents. Thus, the defendant was working both sides and profiting from each. He benefited professionally by providing organized crime information to the FBI, and he benefited personally and financially by assisting Bulger and Flemmi.
The jury learned about some of the confidential information the defendant provided to Bulger and Flemmi. For example, in 1976, the defendant warned Bulger and Flemmi that Richard Castucci, another FBI confidential informant, had given the FBI the location of two Winter Hill Gang members who were federal fugitives. Based on the information provided to them by the defendant, Bulger and Flemmi warned the two fugitives, and they, along with Martorano, murdered Castucci for his disclosures to the FBI. In 1978, the defendant also warned Bulger and Flemmi that they were about to be indicted in a federal racketeering case, but the defendant told them that if they agreed not to kill Anthony “Tony” Ciulla, who was cooperating with the government as a witness against members of their criminal organization, Bulger and Flemmi would not be indicted. Additionally, the defendant warned Bulger and Flemmi that Martora-no was going to be indicted. As a result, Martorano went into hiding in Miami.
In 1978, Callahan, the victim in the instant case, was the owner and president of World Jai Alai. When Callahan learned that the authorities in Connecticut had discovered his ties to the Winter Hill Gang and other organized crime figures in Boston, he sold World Jai Alai to Roger Wheeler (“Wheeler”). Four years later, when Callahan decided that he wanted to repurchase World Jai Alai from Wheeler, but Wheeler refused to sell, Callahan solicited Bulger, Flemmi, and Martorano to murder Wheeler. On May 27, 1981, Mar- *900 torano shot and killed Wheeler at a country club in Tulsa, Oklahoma.
During its investigation of the Wheeler , murder, the FBI began searching for members of the Winter Hill Gang to cooperate with the FBI. Brian Halloran (“Hal-loran”), a member of the Winter Hill Gang who had been indicted for an unrelated murder in Boston, agreed to cooperate with the FBI in the'Wheeler murder investigation in order to obtain leniency in his pending case.
When the defendant learned from his supervisor, Special Agent John Morris, that Halloran was cooperating with the FBI and that Halloran had implicated Bul-ger and Flemmi in the Wheeler murder, the defendant warned Bulger and Flemmi. After this initial warning, the defendant contacted Bulger and Flemmi again to warn them that the FBI had outfitted Halloran with a body wire and had directed Halloran to meet with Callahan. After being alerted by the defendant, Bulger and Flemmi warned Callahan that Halloran intended to inform on him, and Bulger, with the help of other Winter Hill Gang members, murdered Halloran.
Because the Halloran murder was committed on a public street in Boston, the investigation intensified. In an effort to deflect suspicion away from Bulger, Flem-mi, and the Winter Hill Gang, the defendant prepared and submitted a series of false reports suggesting that other organized crime factions in Boston were responsible for Halloran’s murder. Despite the defendant’s efforts, the FBI continued to believe that Bulger and Flemmi were involved in the Wheeler and Halloran murders, and its investigation focused on locating Callahan to obtain his cooperation. When the defendant learned that the FBI was looking for Callahan, the defendant contacted Bulger and Flemmi and told them that Callahan would likely cooperate and implicate Bulger, Flemmi, and Marto-rano in the Wheeler murder, and the defendant suggested that they contact their hit man, Martorano, to “handle it” so none of them would be caught.
Thereafter, Bulger and Flemmi met with Martorano, informed him what the defendant had told them, and Martorano agreed to kill Callahan before the FBI could locate him, specifically agreeing to kill Callahan in Florida because of the “heat on them” in Boston. After meeting with Martorano, Bulger and Flemmi met with the defendant and told the defendant that Martorano and his associate, Joe MacDonald, were going to “take care of’ Callahan. Flemmi testified that the defendant clearly knew that “tak[ing] care of’ Callahan meant they were going to have Callahan killed based on the information the defendant had given them — that the FBI would find Callahan, who would likely cooperate with the FBI and implicate Bul-ger, Flemmi, and Martorano in Wheeler’s murder. On July 31, 1982, Martorano met Callahan at the Fort Lauderdale Airport, shot Callahan in the back of the head, put Callahan in the trunk of a car, and left the car and body at the Miami International Airport.
In anticipation of Callahan’s murder, the defendant filed false reports with the FBI in an effort to mislead the FBI and to protect Bulger and Flemmi. In these reports, the defendant provided alibis for Flemmi and Bulger for both the Halloran murder and the planned Callahan murder, and the defendant also falsely reported that Callahan had a falling-out with a group of Cuban drug dealers in Miami in order to deflect the FBI’s attention away from Flemmi, Bulger, and Martorano.
After Callahan was murdered, the FBI and other law enforcement agencies redoubled their efforts into the investigation, and the defendant continued to manipulate the system to protect Bulger, Flemmi, and *901 himself. However, in 1990, after the defendant had retired from the FBI, Bulger and Flemmi became the subjects of a federal grand jury investigation. The defendant, who had maintained his relationship with other FBI agents, kept Bulger and Flemmi informed as to the progress being made in the FBI’s investigation of Bulger and Flemmi, and, when the defendant learned Bulger and Flemmi were about to be indicted by the federal grand jury and arrested, he warned them. Bulger went into hiding, while Flemmi, who did not react quickly enough, was arrested.
After Flemmi was arrested, the defendant wrote a letter to the presiding federal judge in an effort to have Flemmi’s case dismissed. Many of the statements he made in this letter were false. The defendant also provided sensitive FBI information and documents to Flemmi’s defense attorney, and he counseled Flemmi to falsely testify that the defendant’s supervisor, Special Agent Morris, warned Bulger about the federal indictment rather than the defendant.[2] Ultimately, however, Flemmi and others agreed to cooperate with the FBI and other law enforcement agencies, and an amended indictment was filed in 1995 charging the defendant, along with the previously-charged co-defendants (Bulger, Flemmi, and Martorano), with Callahan’s murder. The defendant was tried, and on November 6, 2008, the jury found the defendant guilty of the reclassified lesser included offense of second degree murder with a firearm.

ISSUES RAISED ON APPEAL

1. The indictment
The defendant argues that the indictment failed to provide him with sufficient notice that if he was convicted of a lesser included offense of first degree murder, the lesser included offense could be reclassified based on the defendant’s personal possession of a firearm during the commission of the murder. However, because the defendant did not raise a challenge or an objection to the. indictment or otherwise challenge the reclassification before submitting the reclassification issue to the jury, the defendant has waived the right to contest that issue unless he can demonstrate fundamental error. Specifically, the defendant did not claim that the second degree murder could not be reclassified due to a defect in the indictment or based on the evidence presented until one month after the jury’s verdict, and even then, he did not claim surprise or the lack of due process. Thus, he has failed to preserve any objection to the reclassification of his second degree murder conviction based on a defect in the indictment, and therefore, he must establish fundamental error on this claim to obtain a reversal.
The defendant cannot demonstrate fundamental error because possession of a firearm is not a necessary element of second degree murder; the indictment charges that the second degree murder was committed with a firearm; the indictment references section 775.087, the firearm reclassification/enhancement statute, in both the heading and in the body of the indictment; the State specifically informed the defendant that it intended to prove that he personally carried a firearm during the commission of the murder; the defendant has never claimed surprise or that he was prejudiced in the preparation or presentation of his defense by the reclassification of the homicide offense under section 775.087; and the reclassified second de *902 gree murder was not greater in degree or penalty than the charged first degree premeditated murder.
A. The defendant failed to preserve the alleged defect in the indictment and therefore waived that issue.
To preserve error for appellate review, a contemporaneous, specific objection must be made during trial. Jackson v. State, 983 So.2d 562, 568 (Fla.2008); Gore v. State, 964 So.2d 1257, 1265 (Fla.2007). The Florida Supreme Court has explained that “[t]his requirement is ‘based on practical necessity and basic fairness in the operation of a judicial system.’ ” Insko v. State, 969 So.2d 992, 1001 (Fla.2007) (quoting Castor v. State, 365 So.2d 701, 703 (Fla.1978)).
At no time prior to the jury’s verdict did the defendant raise a challenge or an objection to the reclassification of the murder charged in Count I based on the sufficiency of the indictment. He did not claim the indictment was imprecise, imperfect, or defective. At the charge conference, when the State sought reclassification of the homicide based on the defendant’s personal possession of a firearm during the acts the defendant committed as a co-perpetrator (principal in the first degree) to the homicide, the defendant did not claim surprise, lack of due process, or that the second degree murder could not be reclassified due to a defect in the indictment. In fact, the first time the defendant challenged the sufficiency of the indictment to permit reclassification of the homicide was one month after the jury’s verdict in his untimely filed motion for arrest of judgment, and even to this day, he has not claimed surprise or prejudice in the preparation of his defense. At the charge conference, the defendant generally objected to the jury being instructed on all of the lesser included offenses of first degree premeditated murder because they were time-barred, but the defendant conceded that second degree murder with a firearm was not time-barred because it was a life felony, and he did not claim or argue that the second degree murder could not be reclassified based 'on a defect in the indictment.
The case law is clear: The failure to object to a technical deficiency in the charging document constitutes a waiver, and the time to raise a challenge to the charging document is prior to the jury’s verdict so the deficiency can be cured, not after the verdict is rendered. State v. Burnette, 881 So.2d 693, 693-94 (Fla. 1st DCA 2004). Additionally, the specific argument or legal ground raised on appeal must have been raised and argued below. Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987) (“[T]o preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court.”); see also Tolbert v. State, 679 So.2d 816, 818 (Fla. 4th DCA 1996) (en banc) (finding that, although a necessary element of the lesser included offense was not alleged in the information, the defendant’s objections were not specific enough to preserve the issue for appellate review); Wilson v. State, 383 So.2d 670, 671 (Fla. 5th DCA 1980) (finding that the defendant cannot claim error on appeal where he did not assert the State’s failure to allege the necessary elements of a permissive lesser included offense as a ground for his objection).
A general objection to all lesser included offenses, the same objection made by the defendant in the instant case, has been found by Florida courts to be insufficient to apprise the trial court of the specific reason for the defendant’s objection. For example, in Tolbert, 679 So.2d at 818, the Fourth District Court of Appeal, sitting en *903 banc, declined to address the defendant’s claim on appeal that the charging document did not sufficiently allege the elements of the lesser included offense for which the defendant was convicted because the defendant failed to raise this specific ground before the trial court. Specifically, the Fourth District stated:
We agree with the state that this issue was not preserved for appeal because appellant’s general objections to instructions on any lesser included offenses did not apprise the trial court of the ground now relied upon by the appellant, i.e., that an element of aggravated battery was not alleged in the information. It is well settled that in order to preserve an issue for appellate review, the specific legal ground or argument relied upon for appeal must have been presented to the trial court.

Id.

Similarly, in Courson v. State, 414 So.2d 207, 209 (Fla. 3d DCA 1982), this Court found that Courson’s objection to all lesser included offenses was not sufficient to put the trial court on notice of his specific objection. This Court held that “a defendant must state distinctly the matter to which he objects and the grounds of his objection” to preserve his objection for appellate review. Id.
In the instant case, the defendant generally objected to all lesser included offenses. The only specific objection he made to the lesser included offenses of first degree murder was that they were time-barred. The defendant therefore failed to preserve the specific ground upon which his appeal is now based-that second degree murder could not be reclassified to the non-time-barred offense of second degree murder with a firearm based on a deficiency in the charging document. Thus, any defect or deficiency as to Count I in the indictment was waived, unless the defendant can demonstrate fundamental error.
B. The alleged defect in. the charging document does not constitute fundamental error.
Because the defendant did not object to the reclassification of second degree murder under section 775.087(1) based on a deficiency in the indictment, he must demonstrate that fundamental error occurred. See Jackson, 983 So.2d at 568 (“Errors that have not been preserved by contemporaneous objection can be considered on direct appeal only if the error is fundamental.” (citing Goodwin v. State, 751 So.2d 537, 544 (Fla.1999))); see also § 924.051(3), Fla. Stat. (2008) (“An appeal may not be taken from a judgment or order of a trial court unless a prejudicial error is alleged and is properly preserved or, if not properly preserved, would constitute fundamental error.”).
A review of the indictment, the case law, and the record demonstrates that Count I was not fundamentally defective because: (1) the indictment did not omit an essential element of the charged offense; (2) the indictment referenced section 775.087 in the heading and the body of the charges; (3) the defendant had notice that the State would be seeking a reclassification of his conviction under section 775.087 based on the defendant’s personal possession of a firearm during the commission of the homicide; (4) at no time during the years of postconviction litigation has the defendant claimed surprise or prejudice in the preparation or presentation of his defense; and (5) the reclassified second degree murder was not greater in degree or penalty than the charged first degree murder.
(1) Count I of the indictment did not omit an essential element of the crime.
Under Florida law, technical defects in a charging document are treated *904 differently than the failure to allege an essential element of the crime. An indictment that wholly omits an essential element of a crime is a fundamental defect that may be raised at any time because the indictment fails to charge a crime when an essential element is omitted. State v. Gray, 435 So.2d 816, 818 (Fla.1983). Use or possession of a firearm, however, is not an essential element of second degree murder,[3] but rather, it may serve to allow for a reclassification of the second degree murder from a first degree felony to a life felony or as an enhancement of the sentence imposed. See § 775.087.
Because the defect was not the omission of an essential element of the crime, the defect is fundamental only if the defendant demonstrates that he was denied due process. In other words, because the defendant did not specifically and timely object to reclassification based on a defect in the indictment, and the defect was not the omission of an essential element, he has waived the defect unless he can demonstrate that he had no notice that a conviction for second degree murder could subject him to a reclassification under section 775.087(1) if the jury found he carried a firearm during the commission of the felony. See Delgado v. State, 43 So.3d 132, 133 (Fla. 3d DCA 2010) (“An information is fundamentally defective1 only where it totally omits an essential element of the crime or is so vague, indistinct or indefinite that the defendant is misled or exposed to double jeopardy.”); State v. Wimberly, 459 So.2d 456, 458-59 (Fla. 5th DCA 1984) (“There is a difference between an information that completely fails to charge a crime and one where the charging allegations are incomplete or imprecise. The former is fundamentally defective. However, where the information is merely imperfect or imprecise, the failure to timely file a motion to dismiss under Rule 3.190(c) waives the defect and it cannot be raised for the first time on appeal.... If the information recites the appropriate statute alleged to be violated, and if the statute clearly includes the omitted words, it cannot be said that the imperfection of the information prejudiced the defendant in his defenses.” (citations omitted) (quoting Jones v. State 415 So.2d 852, 853 (Fla. 5th DCA 1982))); Brewer v. State, 413 So.2d 1217, 1221 (Fla. 5th DCA 1982) (en banc) (finding no fundamental error where the deficiency of the charging document was not a total omission of an essential element of the crime); Kane v. State, 392 So.2d 1012, 1013 (Fla. 5th DCA 1981) (same); State v. Cadieu, 353 So.2d 150, 151 (Fla. 1st DCA 1977) (“The law does not favor a strategy of withholding attack on the information until the defendant is in jeopardy, then moving to bar the prosecution entirely.”).
In the instant case, it is undisputed that the indictment properly charged all of the elements of second degree murder, and, as will be discussed in the following sections, the indictment did not mislead the defendant because he had notice that a conviction as to Count I could subject him to a reclassification of the offense based on his personal possession of a firearm during the commission of the offense.
(2) There was no fundamental er\"or because the indictment referenced section 775.087 in the heading and the body of the charge.
In Mesa v. State, this Court, relying on binding Florida Supreme Court precedent, noted that even where the charging docu *905 ment fails to include an essential element of a crime, the defendant’s failure to file a pretrial motion to dismiss the indictment or information constitutes a waiver if the charging document references the specific criminal code the defendant is charged with violating. 632 So.2d 1094, 1097-98 (Fla. 3d DCA 1994) (citing DuBoise v. State, 520 So.2d 260, 265 (Fla.1988)). Applying this standard, this Court held that where the information charging Mesa with attempted second degree murder failed to allege that Mesa possessed a firearm during the commission of the felony, the information was not fundamentally defective because it referenced section 775.087 as one of the statutes the defendant had allegedly violated; the jury found the defendant guilty of possessing a firearm during the commission of the offense; and there was competent evidence to support the jury’s finding. Id. at 1097-98; see also Baker v. State, 4 So.3d 758, 760-61 (Fla. 1st DCA 2009) (holding that the defendant must establish fundamental error because he did not raise an objection to a defect in the information prior to trial and noting that, even where the charging document omits an essential element of the crime, the charging document may still withstand challenge if it references the specific section of the code that details the elements of the offense).
In the instant case, section 775.087 was referenced in both, the heading and the body of Count I of the indictment; the jury found the defendant guilty of carrying a firearm during the commission of the homicide; and there was competent evidence to support the jury’s finding. Thus, no fundamental error has been demonstrated.
(3) There was no fundamental error because the defendant has not claimed or demonstrated prejudice.
“ ‘The test for granting relief based upon a defect in the charging document is actual prejudice.’” Delgado, 43 So.3d at 133 (quoting Gray, 435 So.2d at 818). In the instant case, no actual prejudice has been alleged or shown. The defendant has never claimed surprise or prejudice in the preparation or presentation of his defense. He did not claim surprise, lack of notice, or prejudice at the charge conference when the State requested that the jury be instructed on the firearm reclassification of second degree murder, and he has not asserted that he was surprised or prejudiced in his post-trial motions, appellate briefs, or arguments before this Court.
The record sheds light on why no such claim has been made by the defendant. First, on February 15, 2006, two and a half years prior to trial, the defendant filed and litigated a motion to dismiss Count II, the conspiracy charge, on the basis that the statute of limitations had run on that count prior to the filing of the indictment. In his motion, the defendant argued that conspir-. acy to commit murder was subject to a four-year statute of limitations, and even if this limitations period could be extended for the homicide if the defendant committed the homicide with a firearm, the State would also be required to prove that the defendant was armed with a firearm at the time he conspired with others to commit the homicide in order to permit reclassification of the conspiracy. This argument clearly shows that the defendant recognized the potential for reclassification upon a conviction of the homicide.
In its response to the defendant’s motion to dismiss the conspiracy count, the State readily acknowledged that the jury must find that the defendant actually carried a firearm during the charged offense in order for the defendant to be subject to reclassification under section 775.087(1) and that, although one of the co-defen *906 dants actually shot the victim, the defendant could also be eligible for reclassification based on his own personal possession of a firearm during his actions giving rise to liability for the offense. The State explained that section 775.087(1) provides for the reclassification of a first degree felony to a life felony if the defendant “carried ” “any ” (emphasis in the original) weapon during the commission of the felony. The State not only bolded and underlined “carried” and “any,” the State also specifically told the defendant in its response that it intended to prove at trial that the defendant carried a firearm within the meaning of section 775.087(1) during the relevant time periods alleged in the indictment.
Additionally, the trial court’s order denying the defendant’s motion to dismiss Count II put the defendant on notice that a conviction in Count I could also result in a reclassification of that offense. The trial court’s order specifically found that a first degree felony could be reclassified to a life felony under section 775.087(1), and there is no statute of limitations for a life felony. The trial court’s order also put the defendant on notice that the State intended to seek a reclassification of the conspiracy to commit first degree murder charge because (1)- conspiracy was designated as a life felony in the caption of the indictment; (2) section 775.087 was referenced in the heading of the indictment and in the body of each count of the indictment; and (3) the State alleged in the body of the conspiracy count that the conspiracy was committed with a firearm. Although the defendant’s motion and the State’s response were directed to the conspiracy charge, these pleadings and the trial court’s order put the defendant on notice that Count I could also be reclassified because the indictment also referenced section 775.087 in the heading and in the body of the murder charge in Count I, and it also1 alleged that the homicide was committed with a firearm.
Additionally, because first degree murder cannot be further enhanced or reclassified, the only purpose in referencing section 775.087 in the heading and in the body of Count I was to put the defendant on notice that a conviction for a lesser included offense in that count could subject him to an enhancement and/or a reclassification of the lesser offense. Second degree murder is a necessary lesser included offense of first degree premeditated murder, see State v. Montgomery, 39 So.3d 252, 259 n. 4 (Fla.2010) (citing Fla. Std. Jury Instr. (Crim.) 7.2), and second degree murder with a firearm is not barred by the statute of limitations because it is a life felony. § 775.15(1), Fla. Stat. (1981).
It is well-established Florida law that a lesser included offense of the crime alleged in the charging document can be reclassified under section 775.087(1). See Miller v. State, 460 So.2d 373, 374 (Fla.1984). The defendant was therefore put on notice that section 775.087(1) could be used to reclassify second degree murder to a life felony if the State proved and the jury found that the defendant carried, displayed, used, threatened, or attempted to use a firearm during the commission of the homicide.- Because second degree murder is a necessary lesser included offense of first degree premeditated murder, and second degree murder with a firearm was not barred by the statute of limitations, the defendant was on notice that the jury would be charged with considering second degree murder as a lesser included offense. Thus, the indictment was not fundamentally defective.
(4) There was no fundamental error because the reclassified second degree murder was not greater in degree or penalty than the charged first degree murder.
In Ray v. State, the Florida Supreme Court cautioned the appellate *907 courts to exercise their discretion concerning fundamental error “ ‘very guardedly,’ ” 403 So.2d 956, 960 (Fla.1981) (quoting Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970)), and “only in the rare cases where jurisdictional error appears or where the interests of justice present a compelling demand for its application,” id. The Court also noted that “[t]he failure to object is a strong indication that, at the time and under the circumstances, the defendant did not regard the alleged fundamental error as harmful or prejudicial.” Id. Further, the Ray Court stated: “ ‘It is well-established law that where the trial judge has extended counsel an opportunity to cure any error, and counsel fails to take advantage of the opportunity, such error, if any, was invited and will not warrant reversal.’” Id. (quoting Sullivan v. State, 303 So.2d 632, 635 (Fla.1974)). Additionally, where defense counsel fails to object to an improper instruction or where he takes affirmative action, such as requesting the improper instruction, he waives any defects. Id. at 961.
Applying these principles in Ray, the Florida Supreme Court held that it was not fundamental error to convict the defendant of an erroneous lesser included offense when the defendant failed to object if: (1) the offense is lesser in degree and penalty than the main offense, or (2) defense counsel requested or relied on the charge or took other affirmative action. Id. “Failure to timely object precludes relief from such a conviction.” Id. (emphasis added).
Relying on Ray, this Court concluded in Mitchell v. State, 689 So.2d 1118, 1120 (Fla. 3d DCA 1997), that no fundamental error had occurred in the reclassification of Mitchell’s manslaughter conviction from a second degree felony to a first degree felony under section 775.087(1), the weapon reclassification statute, where Mitchell did not object to the jury instructions or verdict form, the jury found the offense was committed with a firearm, and Mitchell was not convicted of an offense greater in degree or penalty than the charged offense. See also Diaz-Gonzalez v. State, 932 So.2d 528, 529-30 (Fla. 3d DCA 2006) (citing Ray and declining to address on appeal the alleged defect in the charging document where the defendant failed to raise the issue at trial).
In the instant case, although the defendant had ample time to object to the indictment and to the reclassification of the lesser included offense of second degree murder under section 775.087(1) before trial and at the charge conference before the jury was instructed, he failed to do so.[4] Although defense counsel objected to the trial court instructing the jury on any less *908 er included offenses because they were barred by the statute of limitations, he conceded that second degree murder with a firearm was not similarly barred, and he never argued that the State could not seek reclassification of the second degree murder under section 775.087(1) because the firearm reclassification was not properly charged in the indictment. Instead, defense counsel affirmatively requested the trial court to include the firearm reclassification as a necessary element of second degree murder when charging the jury because second degree murder with a firearm was the only lesser included offense of first degree murder that was not time barred. The State agreed, and the jury was instructed as the defendant requested. Thus, the jury was instructed that the lesser included offense of first degree premeditated murder was second degree murder with a firearm, and the jury instruction included four elements: the three statutory elements for second degree murder and the possession of a firearm, all of which the State was required to prove beyond a reasonable doubt.
The defendant did not demonstrate fundamental error because he did not object to the reclassification of the second degree murder under section 775.087(1); he took affirmative action by requesting that the reclassification be made an element of second degree murder; there was abundant evidence that the defendant carried a firearm during the commission of the murder; and second degree murder with a firearm is an offense lesser in degree and penalty than first degree premeditated murder.
II. The jury’s verdict
The defendant’s second contention is that the jury’s verdict was insufficient to subject him to reclassification under section 775.087(1). While the defendant is correct that it is generally advisable for the trial court to instruct the jury to indicate whether the defendant was armed with a firearm during the commission of the offense via a special interrogatory, no special interrogatory was requested by the defendant. Further, a special interrogatory was not required in this case because, based on the defendant’s specific request, the firearm reclassification was included as an essential element of second degree murder in both the jury instructions and the verdict form.
Specifically, the jury was instructed that the only lesser included offense of first degree premeditated murder it could consider was second degree murder with a firearm, not simply second degree murder. The jury was also instructed that before it could find the defendant guilty of second degree murder with a firearm, as a lesser included offense of first degree murder, they must find beyond a reasonable doubt that the defendant personally carried a firearm during the commission of the murder. Specifically, the jury was instructed as follows:
To prove the crime of Second Degree Murder, with a Firearm, as a lesser included offense the State must prove the following four elements beyond a reasonable doubt:
1. JOHN CALLAHAN is dead.
2. The death was caused by the criminal act of JOHN J. CONNOLLY, JR.
3. There was an unlawful killing of JOHN CALLAHAN by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.
4. During the “act” the defendant John Connolly carried a firearm.
An “act” includes a series of related actions arising from and performed pursuant to a single design or purpose.
An act is “imminently dangerous to another and demonstrating a depraved *909 mind” if it is an act or series of acts that:
1. a person * of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
2. is done from ill will, hatred, spite or an evil intent, and
3. is of such a nature that the act itself indicates an indifference to human life.
In order to convict of Second Degree Murder with a Firearm, it is not necessary for the State to prove the defendant had an intent to cause death,
(emphasis added).
The State also clarified its theory of prosecution, the trial court’s instructions, and the verdict form in its closing arguments. The State explained to the jury, without any objection by the defendant, that there was no dispute that the defendant was not physically present when Mar-torano killed Callahan, but that the defendant need not be present when the killing took place so long as the defendant committed some act or said some word which was intended to incite, cause, encourage, assist, or advise the other person or persons who actually committed the murder under the law regarding principals and accomplices.
The State then explained that there were two relevant guns in this case: the gun Martorano used to actually shoot and kill Callahan and the gun carried by the defendant when he committed the acts that made him a principal to the murder. The State specifically went over the jury instructions for second degree murder and the evidence that had been presented regarding the defendant’s possession of a firearm during his role in Callahan’s murder.
The State also told the jurors that before they could find the defendant guilty of second degree murder with a firearm, as a lesser included offense of first degree premeditated murder, the State had to prove four elements beyond a reasonable doubt. When addressing the fourth element, that during the “act” the defendant carried a firearm, the State explained:
And the fourth, which is a unique act element, which applies to this and the criminal conspiracy as well, is that during the act the defendant, John Connolly, carried a firearm.
Now what does that mean? It does not mean that John Connolly had to have a gun and shoot Callahan. It meant and it means that during the time John Connolly is advising, discussing, assisting and conspiring with Flemmi, Bulger and ultimately Mar-torano that he had a gun.
And how do you know he had a gun? Because he’s an FBI agent, and all the witnesses told you that as an FBI agent he’s required to carry his gun.
He carried his gun. He had his gun. Flemmi saw it when they met. And if you — when he’s meeting with his informants every agent says, you don’t meet with an informant without a gun.
And he’s an FBI agent. And, you know, he was carrying his gun. He doesn’t have to have used his own gun, just had to have had it at the time he’s discussing it with them.
And the act includes a series of related actions arising from and performed pursuant to a single design or purpose. And in this case, it’s the murder of John Callahan.
(emphasis added).
Lastly, the verdict form specifically required the jury to find that the defendant personally carried a firearm during the acts he committed which caused the death of Callahan in order to convict the defendant of second degree murder with a firearm. Notably, while the firearm language *910 was not included in the verdict form for first degree murder, it was included in the verdict form for second degree murder with a firearm.

VERDICT-COUNT I

We the jury, in Miami-Dade County, Florida, this 6 day of NOVEMBER, 2008, find the defendant, JOHN J. CONNOLLY, JR.,
COUNT 1 (check only one):
□ GUILTY of FIRST DEGREE MURDER AS CHARGED IN COUNT 1 ■ OF THE INDICTMENT.
0 GUILTY of SECOND DEGREE MURDER, WITH A FIREARM, . AS A LESSER-INCLUDED OFFENSE OF FIRST DEGREE MURDER.
□ NOT GUILTY
Because the firearm reclassification was treated as an element of second degree murder, and based on the State’s arguments to the jury, the trial court’s instructions to the jury that it must find that the defendant carried a firearm during the acts he committed as a principal to Callahan’s murder as a necessary element of second degree murder with a firearm, and the jury’s verdict reflecting that the State proved the firearm element beyond a reasonable doubt, the jury’s verdict sufficiently supports the firearm reclassification of the second degree murder.
III. The reclassification of second degree murder was based on the defendant’s personal possession of a firearm, not on a co-defendant’s use of a firearm during the commission of the homicide
We agree with the defendant that his conviction for second degree murder could not be reclassified under section 775.087(1) based on a co-defendant’s possession or use of a weapon or firearm during the commission of the murder. The dissent’s assertion that we conclude otherwise is therefore misplaced. Florida law is well-settled that section 775.087(1) does not permit vicarious enhancement. See State v. Rodriguez, 602 So.2d 1270, 1271 (Fla.1992) (holding that “section 775.087(1) does not, by its terms, allow for vicarious enhancement because of the action of a codefendant”); Chase v. State, 74 So.3d 1138, 1139 (Fla. 2d DCA 2011) (reversing the reclassification of the defendant’s conviction for aggravated battery where there was no evidence that the defendant possessed or used a weapon during the commission of the offense); Campbell v. State, 935 So.2d 614, 618 (Fla. 3d DCA 2006) (finding that it was error to reclassify Campbell’s conviction for conspiracy to traffic in cocaine under section 775.087(1) where there was no evidence that Campbell had actual physical or personal possession of a weapon at any time during the conspiracy); Parker v. State, 906 So.2d 1273, 1273 (Fla. 5th DCA 2005) (noting that enhancement under section 775.087(1) is impermissible unless the defendant actually possesses a weapon during the commission of a crime); Betancourt v. State, 767 So.2d 557, 557 n. 1 (Fla. 3d DCA 2000) (noting that the State properly conceded below that the reclassification of the kidnapping conviction was error where the co-defendant, not the defendant, possessed the firearm).
We fully agree that the defendant’s conviction could not have been reclassified due to Martorano’s use of a firearm. However, the defendant’s second degree murder conviction in the instant case was not reclassified based Martorano’s possession or use of a firearm during the commission of the murder. Rather, the reclassification was based solely on the defendant’s own actual and personal possession of a totally separate firearm during his involvement in the commission of the homicide.
*911 The defendant was convicted as a principal of the second degree murder of Callahan, see § 777.011, Fla. Stat. (2005)[5] (making those who actually commit or aid, abet, or procure the commission of a felony principals in the first degree), and the jury found that the defendant was personally armed with a firearm during the commission of the second degree murder. There was ample evidence at trial to support this finding as several witnesses testified that the defendant had a firearm at all the meetings where he met with Bulger and Flemmi. Thus, there was no vicarious enhancement, only a proper reclassification based on the defendant’s personal possession of a firearm.
IV. Reclassification under section 775.087(1) does not require possession of the murder weapon
Section 775.087(1) does not require, as the dissent claims, the defendant’s use or possession of the actual murder weapon. Rather, section 775.087(1) allows for reclassification of an offense if the defendant carries any weapon or firearm at any time during the commission of the felony.
The dissent’s position to the contrary is based on its misreading of Rodriguez. In. Rodriguez, the Florida Supreme Court once again addressed the impropriety of vicarious enhancement or reclassification— as we recognized above — and reiterated that a defendant’s sentence may not be enhanced based on a co-defendant’s possession of a weapon: “We have jurisdiction and answer the question in the negative, finding in accordance with the district court decision, that section 775.087(1) does not, by its terms, allow for vicarious enhancement because of the action of a code-fendant.” 602 So.2d at 1271 (footnote omitted). The Florida Supreme Court further held that because the defendant was charged with use of the weapon during the commission of the felony and the State did not prove that Rodriguez had personal possession of the weapon used during the commission of the offense, enhancement was improper. Id. at 1272. Importantly, however, the Florida Supreme Court noted that “Rodriguez’s sentence could have been enhanced under the statute if the State had charged him with the commission of a felony while carrying the pistol that was found on his person after the chase.” Id. (emphasis added).
Thus, contrary to the dissent, a defendant’s sentence may be enhanced or reclassified if the defendant carried any firearm during the commission of the homicide. The law does not require that the defendant be the actual shooter. Indeed, such a holding would entirely negate all the language in section 775.087 except for “use” of a weapon. Thus, if two men enter, a business with the intent to rob and murder the owner, and both are armed with firearms, the State may seek reclassification of both perpetrators’ convictions based on their respective possession of a firearm, even if only one of the perpetrators shoots and kills the victim. Reclassification of the shooter’s convictions would be based on his possession and use of the murder weapon, while the reclassification of the co-perpetrator’s convictions would be based on his possession of a second firearm during the commission of the offense even though he only “carried” and did not use or threaten the victim with his firearm. See Andrade v. State, 564 So.2d 238, 239 (Fla. 3d DCA 1990) (finding no error in enhancement of Andrade’s convictions for three counts of attempted murder *912 and the imposition of three-year minimum mandatory sentences as to each conviction where there was evidence that established that Andrade possessed a firearm during the criminal episode); Junco v. State, 510 So.2d 909, 913 (Fla. 3d DCA 1987) (affirming Junco’s and his co-defendant’s convictions for second degree murder with a firearm, attempted second degree murder, robbery with a firearm, trafficking in cannabis, and the enhancement of their sentences where it was established that each possessed a firearm when participating in the criminal offense).
In this case, during the commission of the homicide the defendant committed acts as a principal in the first degree, and whilé committing these acts, he indisputably carried a firearm. Thus, section 775.087(1) was correctly applied to reclassify the offense.
Section 775.087(1) provides in' relevant part as follows:
(1) Unless otherwise provided by law, whenever a person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, and during the commission of such felony the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm, or during the commission of such felony the defendant commits an aggravated battery, the felony for which the person is charged shall be reclassified....
(emphasis added).
The statute is clear and unambiguous. “Use” of “the” firearm (or weapon) during the commission of the felony is simply not required, and the dissent’s narrow reading of the reclassification statute has no basis in Florida law. It is merely one of many options from which the State can choose to reclassify an offense. Here, the jury found that the defendant carried a firearm during the acts he committed during the commission of, and which subjected him to his conviction for, the second degree murder. If a defendant “carries” “any” weapon during the commission of the felony, section 775.087(1) is applicable.
Y. Florida law does not treat actual perpetrators and aiders and abettors differently, and application of section 775.087(1) does not rely on the role each plays duriny the commission of the offense
Under Florida law, those who actually commit the offense and those who aid, abet, or procure the commission of an offense are treated the same regardless of their role in the commission of the offense or whether they are present at the scene during the final acts of the offense. State v. Dene, 533 So.2d 265, 266-69 (Fla.1988); Potts v. State, 430 So.2d 900, 901-02 (Fla.1982). In 1957, the Florida Legislature eliminated these distinctions.
Prior to 1957, Florida law provided different classifications for perpetrators depending on their level of participation in the offense. Those who actually committed the offense were treated as principals in the first degree; those who were present when the crime was being committed and aided and abetted the commission of the crime were treated as principals in the second degree; those who were not present while the crime was being committed but procured, counseled, commanded, or abetted another to commit the crime were treated as accessories before the fact; and those who knew a felony had been committed and then assisted the felon afterward were treated as accessories after the fact. Potts, 430 So.2d at 901.
In 1957, the Florida Legislature retained the category of accessories after the fact but eliminated the distinctions between principals in the first degree (the actual perpetrator), principals in the second degree, and accessories before the fact *913 and now treats them the same, referring to perpetrators and accomplices alike as “principal[s] in the first degree.” Ch. 57-310, §§ 1-2, at 608, Laws of Fla.; Dene, 533 So.2d at 267 (concluding that “[t]he effect of this law was that the traditional definitions of principal in the first degree, principal in the second degree, and accessory before the fact were all combined within the statutory definition of principal in the first degree”) (emphasis added).
Since 1957, actual perpetrators, as well as aiders and abettors, whether before or during the offense and whether present or not present at the scene, are all “principals in the first degree,” and they are treated the same and are equally culpable under the law. Staten, 519 So.2d at 624 (Fla.1988); see also § 777.011, Fla. Stat. (2005) (renumbered in 1977 from section 776.011 to section 777.011). Section 777.011 provides as follows:
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
(emphasis added).
The Florida Legislature specifically stated the following in Chapter 57-310 of the Laws of Florida when it abolished the distinctions between perpetrators (principals in the first degree), principals in the second degree, and accessories before the fact:
WHEREAS, the legal distinctions between accessory before the fact, principal in the first degree and principal in the second degree serve no useful purpose; and
WHEREAS, these distinctions serve only as technicalities which impede the orderly administration of justice for the benefit of those charged with crimes, and as such should be abolished....
Ch. 57-310, at 608, Laws of Fla. And, as the Florida Supreme Court recognized in Dene, “The legislative intent could not have been clearer.” 533 So.2d at 266.
The dissent, however, takes the position that reclassification of the murder in this case under section 775.087(1) is only permissible for what it calls the “actual perpetrator,” i.e., the person who shot the victim in the head. Thus, based on the dissent’s position, even if another individual (“Perp.# 2”) held the victim at gunpoint while his accomplice (“Perp.# 1”) shot and killed the victim, only Perp. # 1 would be subject to reclassification. The dissent’s position is contrary to section 777.011 (the law of principals) and section 775.087(1) (the law regarding reclassification of offenses). Section 777.011 mandates that perpetrators and aiders and abettors are all “principals” and “may be charged, convicted and punished as such.” Florida law does not identify some of the participants of the offense as “perpetrators” and others as “principals.” They are all “principals” if they actually committed, aided, abetted, counseled, hired, or procured such offense to be committed. And section 775.087(1) provides, in pertinent part that “Whenever a person is charged with a felony ... and during the commission of such felony the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm ... the felony for which the person is charged shall be classified as follows.... ”
*914 It now no longer matters whether the defendant hired (procured) a hit man, turned to his mob friends to murder Callahan, served as a lookout, provided the gun, or pulled the trigger himself, he is a principal in the first degree. See Staten, 519 So.2d at 624 (“Under our law, both the actor and those who aid and abet in the commission of a crime are principals in the first degree_Clearly, the getaway driver who has prior knowledge of the criminal plan and is ‘waiting to help the robbers escape,’ falls into this category and is, therefore, a principal.” (footnote and citations omitted) (quoting Enmund v. State, 399 So.2d 1362, 1370 (Fla.1981), rev’d on other grounds, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982))). As long as the State proves that the act the defendant committed was “imminently dangerous to another and evincing a depraved mind regardless of human life” and the act caused the victim’s death, § 782.04(2), the defendant is guilty as a principal for the second degree murder of Callahan. And because the defendant was armed with a firearm when he committed these acts, reclassification under section 775.087(1) was lawful.
Thus, contrary to the dissent’s position, for nearly sixty years, Florida has treated the “actual perpetrator” and aiders and abettors the same regardless of their roles in the offense (they are all principals in the first degree), and section 775.087(1) provides for reclassification of the offense if during the commission of the offense the defendant carries, displays, etc. a firearm. Section '775.087(1) does not limit its application to “the actual perpetrator,” nor would it make sense to do so since actual perpetrators and aiders and abettors are all “principals] in the first degree.” § 777.011. As the Florida Legislature specifically noted, such distinctions “serve no useful purpose.” Ch. 57-310, at 680, Laws of Fla.
VI. Reclassification of the second degree murder was lawful because the State presented evidence and the jury found that the defendant personally carried a firearm during his role as a “principal in the first degree” to second degree murder
Lastly, the defendant suggests, and the dissenting opinion and the concurring in part and dissenting in part opinion (which for purposes of addressing this argument will be referred to collectively as “the dissenters”) conclude that reclassification under section 775.087(1) may only occur if the firearm the defendant was carrying was both temporally and spatially related to the homicide. Thus, the dissenters contend that because the defendant was hundreds of miles away in Boston when the victim was shot in Miami, it was fundamental error to reclassify his second degree murder conviction. This argument is based, in part, on the premise that, unlike certain on-going or continuing offenses (such as conspiracy, theft, and trafficking), the homicide was committed only at the precise moment the trigger was pulled. As will be discussed below, the Florida Legislature has not engrafted such a requirement into the reclassification statute; the death of the victim was the result of a series of acts, not the sole act of the shooter; the acts committed by the defendant were imminently dangerous demonstrating a depraved mind without regard for human life; these acts caused the victim’s death; and during the acts committed by the defendant, the defendant was armed with (carried) a firearm. Thus, the defendant was properly convicted of second degree murder with a firearm, and reclassification of his murder conviction was not error, much less fundamental error.
*915 A. “During the commission of’ does not require spatial proximity
The relevant language in section 775.087(1) provides that “whenever a person is charged with a felony ... and during the commission of such felony the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm, ... the felony for which the person is charged shall be reclassified.” (emphasis added). The phrase “during the commission of’ is not expressly defined in the statute, likely because these words need no further explanation when given their plain and ordinary meaning. See Daniels v. Fla. Dep’t of Health, 898 So.2d 61, 64 (Fla.2005) (holding that if the language is plain and unambiguous it is unnecessary to resort to statutory construction).
The Merriam-Webster Dictionary defines “during” as “at some time in the course of (something).” (emphasis added). The evidence presented in this case clearly established that the defendant carried a firearm “at some time in the course of’ committing this second degree murder.
Second degree murder is the unlawful lolling of the victim “by an act” that is “imminently dangerous to another and evincing a depraved mind regardless of human life....” § 782.04(2), Fla. Stat. (1981). Florida’s standard jury instruction on second degree murder defines an “act” as “a series of related actions arising from and performed pursuant to a single design or purpose.” Fla. Std. Jury Instr. (Crim.) 7.4. The same instruction explains that:.
An act is “imminently dangerous to another and demonstrating a depraved mind” if it is an act or series of acts that:
1.a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
2. is done from ill will, hatred, spite or an evil intent, and
3. is of such a nature that the act itself indicated an indifference to human life.
In order to convict of Second Degree Murder, it is not necessary for the State to prove the defendant had an intent to cause death.
The jury found that the acts the defendant committed — counseling members of the Winter Hill Gang to “take care of’ Callahan — were imminently dangerous to another evincing a depraved mind because the defendant knew that when he told Bulger and Flemmi that the FBI was trying to locate Callahan to obtain his cooperation and also told them to contact Marto-rano to “handle it,” he was signing a death warrant for the murder of Callahan. When the defendant provided similar information to Bulger and Flemmi in the past, they murdered or procured the murder of the cooperating witnesses. For example, when the defendant warned Bulger and Flemmi that Castucci was cooperating with the FBI, Bulger, Flemmi, and Marto-rano .murdered Castucci. When the defendant warned Bulger and Flemmi that Halloran was cooperating with the FBI, Bulger, Flemmi, and other Winter Hill Gang members murdered Halloran. Thus, when the defendant told Bulger and Flem-mi that the FBI was looking for Callahan and that he believed Callahan would likely cooperate with the FBI and implicate Bul-ger, Flemmi, and Martorano, the defendant knew the result: Callahan would be murdered.
This act was done from ill will and an evil intent, and indicated an indifference to human life. The defendant wanted to protect Bulger, Flemmi, Martorano, and himself from criminal prosecution. He believed that once the FBI located Callahan and implicated Callahan in Wheeler’s mur *916 der, Callahan would cooperate with the FBI for a reduced sentence, and Callahan’s cooperation would implicate Bulger, Flemmi, Martorano, and the defendant in the Wheeler murder and other killings. The defendant therefore knew that Callahan needed to be silenced, and the way in which Bulger, Flemmi, and Martorano would silence Callahan was in the same way they silenced Castucci, Wheeler, and Halloran — by murdering him.
The State also proved that during this act the defendant was armed with (“carried”) a firearm. Thus, during' the commission of the second degree murder (the unlawful killing of the victim by an act of the defendant that was imminently dangerous to another demonstrating a depraved mind without regard for human life), the defendant carried a firearm and the defendant’s conviction was lawfully reclassified pursuant to section 775.087(1).
The dissenters seek to engraft a requirement into the text of section 775.087(1) that is not present — that the carrying of the firearm must be “both temporally and spatially related to the crime committed.” However, the wording of the statute itself and a comparison to similar legislation demonstrates that the Florida Legislature did not include such a requirement and it intended that the reach of section 775.087 be as broad as possible, but tempered by prosecutorial discretion.
The relevant language in section 775.087(1) provides that “whenever a person is charged with a felony ... and during the commission of such felony the defendant carries, displays, uses, threatens to use or attempts to use any weapon or firearm ... the felony for which the person is charged shall be reclassified.” (emphasis added). Compare the emphasized language in 775.087(1) to a similar federal provision, 18 U.S.C. § 924(c)(1)(A), which provides that:
“[A]ny person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime [be sentenced to a minimum mandatory sentence to run consecutive to the underlying sentence.]”
(emphasis added).
When comparing section 775.087 (under any of its subsections) to the Federal Code, it becomes glaringly apparent that the reach of section 775.087 of the Florida Statutes is substantially broader than that of section 924(c)(1)(A) of the Federal Code because the word “during” (at some time in the course of) in the Florida statute contemplates only a temporal relationship to the underlying crime, whereas the terms “during and in relation to” and “in furtherance of’ in the Federal Code necessarily require a substantial nexus between the weapon carried and the charged offense. See, e.g., U.S. v. Gonzalez, 528 F.3d 1207, 1212 (9th Cir.2008) (concluding that under Federal law, the determination of whether the “ ⅛ furtherance’ requirement is met is a ‘fact-based inquiry into the nexus between possession of the firearm and the drug crime[,]’ including such factors as ‘proximity, accessibility and strategic location of the firearms in relation to the locus of drug activities’ ”) (alteration in original) (quoting United States v. Hector, 474 F.3d 1150, 1156-57 (9th Cir.2007))). United States v. Guidry, 456 F.3d 493, 508 (5th Cir.2006) (“To be carried ‘in relation to’ an offense under this section, a gun must have ‘some purpose or effect with respect to the crime of violence.’ ” (internal quotation marks omitted) (quoting United States v. Polk, 118 F.3d 286, 293 (5th Cir.1997))). Florida’s statute, section 775.087, however, does not include the “in relation to” or “in furtherance of’ language *917 contained in its federal counterpart. Unlike the Federal Code, Florida’s statute does not require any “functional” or spatial nexus for the carried firearm as the dissenters assert, nor does it require any coincidence of purpose with the underlying offense. It merely requires that the defendant carry a weapon during the commission of the felony, and in this case it was proven, and the jury found, that during the acts the defendant committed during the commission of the homicide, he carried a firearm.
We must assume that the Florida Legislature chose its words carefully when drafting section 775.087, and it clearly chose to use very broad language to encompass a wide variety of factual permutations. Not only does section 775.087(1) require reclassification when the weapon is utilized “during the commission of [the] felony,” it also allows the offense to be reclassified if the defendant “carries, displays, uses, threatens to use, or attempts to use” any weapon during the commission of the felony. It is clear that the ambit of section 775.087 is to allow harsher sentencing for defendants who in any way associate with a weapon while engaging in felonies. Thus, any person who carries any weapon while engaged in a felony is subject to harsher sentencing under section 775.087.
B. Section 775.087 does not require that a principal be present when the “last act” was committed
Besides attempting to add this “spatial and temporal proximity” language to section 775.087(1), which does not appear in the statute under any of its provisions, the dissenters conclude that second degree murder is a “discrete offense,” and because the defendant was not present when the “last act” to the murder was committed (the shooting of the victim), his conviction for second degree murder cannot be reclassified pursuant to section 775.087(1). This conclusion rests on the premises that: (1) application of section 775.087(1) differs between “actual perpetrators” and aiders and abettors; and (2) second degree murder is a “discrete offense” that is only committed upon the completion of the crime—in other words, when the victim was shot and he died— and the defendant must have been present and armed when this last act occurred.
The first premise is wrong because as previously explained, the Florida Legislature eliminated the disparate treatment between “actual perpetrators” and aiders and abettors nearly sixty years ago. Perpetrators, who were always statutorily referred to as “principals in the first degree,” and aiders and abettors are now all “principals] in the first degree,” and section 777.011 provides that each may be “charged, convicted, and punished” the same. Section 775.087(1) does not alter this general principal of law, and thus, all principals are treated alike. If a principal is armed during the commission of the felony, his offense may be reclassified under section 775.087(1) whether or not he is present. “Whoever commits any criminal offense against the state, ... or aids, abets, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first, degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offenses.” § 777.011.
The second premise is wrong because, while it is true that the offense committed by Bulger, Flemmi, Martorano, and the defendant did not become a second degree murder until the victim died, see § 782.042(2) (requiring that a human be “kill[ed]” before the defendant can be charged with second degree murder), a defendant need not be present at the scene *918 (“spatial and temporal proximity”) when the last element of the second degree murder occurred to permit reclassification of the murder for the defendant’s possession of a firearm during the commission of the offense. The dissenters essentially argue that the defendant must carry a weapon during every element of a particular crime, but the word “during” contemplates the carrying of a weapon at any point (while committing any element) in the course of the offense.
The fallacy of this interpretation of “during the commission of’ can easily be demonstrated in the following hypothetical. Defendants #1, #2, and # 3 decide to murder the victim. Defendant # l’s assigned role in the homicide is to pick up the victim at Miami International Airport and to deliver him to Defendant # 2 at a warehouse in Hialeah. Because the victim weighs 265 pounds, is a reputed enforcer for the mob, and may not willingly get into Defendant # l’s car, Defendant # 1 arms himself with a firearm. Everything, however, goes smoothly, and Defendant # 1, who is armed with a firearm, delivers the victim to Defendant # 2, and Defendant # 1 promptly leaves the warehouse and begins driving to Atlanta, Georgia, where he lives. While at the warehouse, Defendant #2 decides to extract information from the victim before shooting him and accordingly keeps the victim in the warehouse for two days where he tortures the victim. Two days later, while Defendant # 1 is in Atlanta, Defendant # 2 finally shoots the victim, as planned, and calls Defendant # 3 to dispose of the body. Defendant # 3 arrives shortly thereafter. He too is armed with a firearm. Defendant # 3 picks up the victim, who is still breathing; puts the victim in his car; places his revolver on the seat next to him as a precautionary measure; and dumps the victim in an isolated field. The victim lingers for over twelve hours, but he eventually dies.
Under this scenario, if we applied the “last act” requirement as suggested by the dissenters, even though each of the defendants was armed during his role in the homicide, only Defendant # 3, who committed the last act — dumping the victim’s body at a deserted location where he could not seek help and where he ultimately died — would be subject to reclassification under section 775.087(1). Although Defendant # 2 shot the victim and both Defendants # 1 and # 3 were principals in the first degree to the murder, because neither Defendant # 1 nor Defendant # 2 was present during the last act that caused the victim’s death, under the dissenters’ interpretation of section 775.087(1), their offenses could not be reclassified even though each was armed with a firearm when they carried out their agreed-upon roles in the homicide. What the dissenters fail to recognize is that all three perpetrators were principals in the first degree to the homicide; section 777.011 requires that they all be treated the same (“may be charged, convicted, and punished as such”); and section 775.087(1) permits reclassification of each of the principal’s convictions if he personally used, threatened to use, carried, etc. a weapon during his participation in the commission of the felony.
The dissenters’ “last act” argument is also defeated by the very language chosen by the Florida Legislature when drafting the statutes defining second degree murder and principals. The statutes establishing the elements of second degree murder and the law governing principals and accomplices specifically contemplate that the 'acts committed by a co-defendant during- the commission of the felony may be committed at any time and any place. Neither section 777.011, the statute pertaining to principals, nor section 782.04(2), the statute pertaining to second degree *919 murder, requires that the defendant be present or that he commit the last act that led to the victim’s demise.
Section 777.011, the principal statute, holds the defendant legally responsible as a principal, whether or not he is present when the crime is committed, if he “did some act” — not the last act — “or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.” See also State v. Dene, 533 So.2d at 270 (holding that, pursuant to section 777.011, a principal does not have to be at the scene of the crime); State v. Lowery, 419 So.2d 621, 623-24 (Fla.1982) (holding that Lowery was as equally culpable as a principal under section 777.011, as his co-felon who actually did the killing, although he was not present when his co-felon murdered the victim).
Similarly, for the defendant to be properly convicted of second degree murder, the State was required to prove that the victim’s death was caused by any criminal act of the defendant that was imminently dangerous to another and demonstrated a depraved mind without regard for human life, not the last act. The jury instructions on second degree murder further explain that:
An “act” includes a series of related actions arising from and performed pursuant to a single design or purpose. An act is “imminently dangerous to another and demonstrating a depraved mind” if it is an act or series of acts that:
(1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
(2) Is done from ill will, hatred, spite or evil intent, and
(3) Is of such a nature that the act itself indicates an indifference to human life.
The defendant does not dispute that there was competent substantial evidence to support his conviction for second degree murder. It is equally clear that neither section 777.011 nor section 782.04(2) requires the defendant to be present when the shooting occurs or during the “last act” that caused the victim’s demise. The defendant and the dissenters, however, would impose such a requirement for reclassification under section 775.087(1) despite the Legislature’s failure to add such language to section 775.087(1).
C. Second degree murder can be an on-going crime
Despite the Florida Legislature’s failure to include a “last act” requirement for imposition of section 775.087(1), the defendant and the dissenters encourage this Court to judicially impose a “last act” requirement for the crime of second degree murder. In doing so, they attempt to distinguish the crime of second degree murder from other crimes where there is case law specifically upholding the reclassification of the offense. They argue that while some crimes may be “continuing crimes,” second degree murder can never be a continuing crime; and unless the crime is a continuing crime, the defendant must be present when the last act was committed to have his sentence reclassified. The dissenters therefore conclude that because the acts the defendant committed occurred prior to the actual shooting — the last act that caused Callahan’s death — his conviction for second degree murder could not be reclassified even though he was armed with a firearm when he committed those acts. We disagree. As we have already shown, there is no requirement under Florida law that the defendant commit the last act that caused the victim’s death, that he be present during this last act, or that he possessed the weapon used during the last act that *920 caused the victim’s death for his murder conviction to be reclassified. And there are numerous scenarios where second degree murder may be an on-going crime.
This Court’s opinion in Junco v. State, 510 So.2d 909 (Fla. 3d DCA 1987), which is in fact a second degree murder and attempted second degree murder case, clearly illustrates this point. In Junco, this Court affirmed the enhancement of Junco’s robbery conviction and the imposition of consecutive three-year minimum mandatory sentences for his possession of a firearm during the commission of the second degree murder of two warehouse guards and the attempted second degree murder of another man even though Junco was not the shooter and was not present when the two guards were shot and killed and the third man was shot and injured. Id. This Court found that enhancement of the two second degree murders and the attempted second degree murder sentences pursuant to section 775.087 was proper, even though Junco was not present when the actual homicides and the attempted homicide were committed, because there was evidence that Junco was a principal to these offenses and he was in possession of a firearm while aiding and abetting the commission of the crimes. Id. This Court reached the same conclusion for Junco’s co-defendant, R. Esquivel, who also did not shoot any of the victims but was armed with a firearm during the commission of the offenses. Id. at 911-13.
The fallacy of the dissenters’ “last act” argument and their conclusion that second degree murder can never be an on-going or a continuing crime can also be illustrated by applying common logic. Consider the following two hypotheticals. In the first hypothetical, a homicide was committed by poisoning the victim. The victim’s husband and son decide to murder the victim, and the husband begins lacing the victim’s food with a deadly poison. While the husband is out of town on a business trip, the son uses the last of the poison they were feeding the victim, so the son obtains another bottle of the lethal substance, and, after the son administers two more doses from the bottle he obtained, the victim finally dies. It is undisputed that the husband was not present when the son administered the last dose of poison from the bottle he obtained. Although the weapon (poison) used by the son during the “last act” was not the same weapon used by the husband, it seems clear that both are criminally liable for the murder and that each was armed with a weapon (the poison) during the acts they committed that were imminently dangerous to another and evincing a depraved mind without regard for human life. Clearly both are guilty of at least second degree murder with a weapon. The dissenters’ rationale would not allow the husband’s sentence to be reclassified because he was not present and did not administer the last dose of poison to the victim, while the son’s conviction could be reclassified — an absurd result. This hypothetical also illustrates how, under certain circumstances, a homicide may be a continuing or an on-going offense. The victim did not die from the doses of poison from the first bottle. She died from the accumulation of the doses administered over time, and, while she did not die until the last dose of poison was administered, each act of poisoning was an act imminently dangerous to the victim without regard for human life, and these acts caused her death. During each act of poisoning, a principal to the murder was armed with a deadly weapon.
In the second hypothetical, Bob the Burglar and Security Sam have a long-standing relationship whereby Sam, using his contacts and the information he obtained by working as a security guard, provides Bob the Burglar with confidential information regarding homes to burglarize. Over *921 the course of this relationship, Bob the Burglar has, on occasion, been confronted by a homeowner or a security guard during the burglary, and during such confrontations, he has killed the occupant. The “job” that results in their undoing is a home on E-Z Street. Sam tells Bob that there is a large quantity of cash, jewelry, and drugs at that location, but also informs him that the homeowner is usually at home and the property is guarded by a hired security guard who Sam knows quite well. Sam tells Bob that he will help Bob commit the burglary by luring the security guard off the property, and it is understood that Bob will do whatever is necessary (i.e., kill the homeowner) if confronted by the homeowner during the burglary.
On the night of the burglary, Sam lures the security guard away from the property, and they go into town for a drink. However, when the security guard begins to get suspicious and tries to return to his post on the property, Sam forces the guard at gunpoint back into the car, hits him on the head with the firearm, and takes the unconscious security guard to a deserted area where he tries to decide what to do next. Meanwhile, while committing the burglary, Bob is confronted by the homeowner. The homeowner activates a silent alarm, Bob shoots the homeowner, and the police arrive while Bob is still burglarizing the house. Although the homeowner dies moments after the police arrive, he is able to tell the police that he has surveillance cameras all throughout his property, explain that a security guard was supposed to be guarding the property, and gives them the security guard’s cell phone number. From this information, the police observe Sam on the surveillance tapes luring the guard into a car, and they are able to track the security guard’s location through the guard’s cell phone. The police locate Sam and the unconscious but otherwise unharmed security guard, and they arrest Sam. Sam was armed with a firearm throughout his participation as a principal to the burglary and the homicide.
Based on these facts, it is clear that both Bob and Sam are guilty of armed burglary and, at a minimum, second degree murder. Because both Bob and Sam were armed with firearms during the commission of the acts that make them guilty of second degree murder, their convictions for second degree murder may be reclassified under section 775.087(1). Just like the defendant in our case, Sam committed acts that caused the death of the victim. The acts he committed were done from ill will, hatred, spite, or evil intent; were imminently dangerous to the victim; demonstrated a depraved mind; and indicated an indifference to human life, which a person of ordinary judgment would certainly know was reasonably certain to cause the death of the victim or cause serious bodily injury to another. Thus, just like the defendant in our case, Sam is guilty of second degree murder because the evidence establishes each and every element of second degree murder; and Sam aided, incited, encouraged, and otherwise assisted Bob in committing the offenses, even though Sam was not present when the shooting occurred and he did not pull the trigger. Additionally, both the burglary and the homicide where on-going crimes. Although Sam was not present when Bob entered the house or shot the victim, he was armed when he committed the acts as a principal to both offenses. Thus, because Bob and Sam in this hypothetical, and the defendant in our case, were armed with firearms during the acts they committed and which caused the death of the victims, their convictions for second degree murder shall be reclassified to life felonies under section 775.087(1).
As these hypotheticals and this Court’s prior opinion in Junco demonstrate, the homicide in the instant case was an on *922 going offense, and the defendant was armed while he committed acts which were intended to and did in fact incite, cause, encourage, assist, or advise his partners in crime (Bulger, Flemmi, and Martorano) to commit the murder, acts that pre-1957 would have made the defendant an accessory before the fact, but since 1957 make him for all purposes a principal in the first degree to the murder. The acts the defendant committed were also acts that were imminently dangerous to the victim, demonstrating a depraved mind without regard for human life, and these acts caused the death of the victim. Thus, whether relying on the language regarding principals or the language of second degree murder itself, the reclassification of the defendant’s conviction for second degree murder was lawful. In short, the murder began when the defendant told Bulger and Flemmi to “take care of’ Callahan, and it ended when Callahan was actually shot and killed. Possession of a weapon at any point in the interim was “during the commission of the felony.”
In 1999, the Florida Legislature specifically addressed the application of subsections (2) and (3) of section 775.087, regarding the imposition of minimum mandatory prison terrhs for criminals who possess firearms during the commission of an offense. In section 27.866, Florida Statutes (1999), the Florida Legislature specified that whenever a criminal offender meets the criteria in sections 775.087(2) and (3), and a minimum mandatory sentence is not imposed, the State Attorney must explain why the minimum mandatory sentence was not imposed in writing and maintain that explanation in the case file. While expressing its “zero tolerance” for those who possess firearms during the commission of an offense, the Florida Legislature recognized that “prosecutors should appropriately exercise their discretion in those cases in which the offenders’ possession of the firearm is incidental to the commission of the crime and not used in furtherance of the crime, used in order to commit the crime, or used in preparation to commit the crime.” Id.
Section 27.366 reads in full as follows:
It is the intent of the Legislature that convicted criminal offenders who meet the criteria in s. 775.087(2) and (3) be sentenced to the minimum mandatory prison terms provided herein. It is the intent of the Legislature to establish zero tolerance of criminals who use, threaten to use, or avail themselves of firearms in order to commit crimes and thereby demonstrate their lack of value for human life. It is also the intent of the Legislature that prosecutors should appropriately exercise their discretion in those cases in which the offenders’ possession of the firearm is incidental to the commission of a crime and not used in furtherance of the crime, used in order to commit the crime, or used in preparation to commit the crime. For every case in which the offender meets the criteria in this act and does not receive the mandatory minimum prison sentence, the state attorney must explain the sentencing deviation in writing and place such explanation in the case file maintained by the state attorney.
Although section 27.366 is directed to subsections (2) and (3) of section 775.087, because section 775.087(1) does not include the “related to” or the “in furtherance of’ language, and the Florida Legislature has expressed its zero tolerance for those who possess firearms during the commission of a crime, we reject the notion that section 775.087(1) should only apply to principals who are present when the last act or last element of a crime is committed, or when the firearm is used in furtherance of the crime. To do so violates the clear and unambiguous language of sections 777.011 (the principal *923 statute), 775.087(1) (the reclassification statute), and 782.04(2) (the second degree murder statute). As the Florida Legislature has clearly stated, the decision as to whether to seek enhancement (or in this case a reclassification) of an offense when the firearm was incidental to the commission of the offense, lies within the State’s discretion. And that discretion is further tempered by the jury’s pardon powers. If the Legislature granted prosecutors the discretion whether to seek enhanced sentences under section 775.087 “in those cases in which the offender’s possession of a firearm is incidental to the commission of a crime and not used in furtherance of a crime, used in order to commit a crime, or used in preparation to commit a crime,” then obviously prosecutors may exercise their discretion, as they did in this case, whether to seek a reclassification of the offense.
VIL Miscellaneous arguments raised in the concurring in part and dissenting in part opinion
Lastly, we address the concurring in part and dissenting in part opinion’s characterization of the defendant’s role in the homicide as an “aider and abettor,” whose acts were simply part of “the planning and preparation for the murder,” and the opinion’s discussion regarding attempts, solicitation, and other criminal statutes. The concurring in part and dissenting in part opinion proclaims that the defendant’s acts merely “consisted of planning and preparation, [ ] which are insufficient to establish commencement of the crime,” and for a crime to be committed, “[tjhere must be proof of an overt act beyond mere preparation.” While this is a correct statement of the law regarding attempts, this case does not involve an attempt. The defendant’s acts occurred during the commission of the completed crime of second degree murder. Rather than addressing whether the defendant was armed during the commission of the sum total of the elements he committed to make him guilty of second degree murder, the dissenters separate the elements and ultimately conclude that the defendant must have been armed with a firearm when one or all of the elements was satisfied in order for reclassification to occur under section 775.087(1).
As stated earlier, second degree murder is the unlawful killing of a human being by any act that is imminently dangerous to another and evincing a depraved mind regardless of human life. § 782.04(2). While it is true that there must be an overt act beyond mere preparation for an attempted murder, we are not discussing whether the defendant could have been convicted of attempted second degree murder if Marto-rano did not shoot Callahan. The crime the defendant and his co-defendants committed went past mere planning and preparation. They picked Callahan up at the airport, shot him in the head, and left his dead body in the trunk of a car in the parking garage at Miami International Airport.
Thus, the concurring in part and dissenting in part’s discussion of “attempt” eases such as Arias v. State, 593 So.2d 260 (Fla. 3d DCA 1992), Morehead v. State, 556 So.2d 523 (Fla. 5th DCA 1990), State v. Coker, 452 So.2d 1135 (Fla. 2d DCA 1984), and Robinson v. State, 263 So.2d 595 (Fla. 3d DCA 1972), sheds no light on the issue in this appeal. The issue in this appeal is whether the defendant’s conviction for the completed crime of second degree murder was lawfully reclassified under section 775.087(1) where the jury found that the defendant committed an act or acts that were imminently dangerous to another and which caused the death of Callahan, the jury found the defendant carried a firearm during these acts, and there was evidence to support the jury’s findings.
*924 Additionally, the defendant did not simply participate in the planning and preparations of the murder, although if that was all he had done, he would still have been equally and legally responsible as a principal in the first degree to the murder. The defendant actually initiated and procured the murder of Callahan, and he did so not only to protect Bulger, Flemmi, and Mar-torano, but to protect himself. He needed Callahan to be silenced so everyone’s acts, which included several murders in which Connolly was involved, would not be exposed. And the defendant was armed with a firearm when he procured, planned and prepared for the murder of Callahan. Callahan would not have been murdered but for the defendant’s initiation of, and participation in, the commission of the murder.
The concurring in part and dissenting in part opinion also boldly asserts that the acts committed by the defendant while he was armed with a firearm were not acts that were imminently dangerous to the victim. The jury, however, found that they were. Moreover, the defendant does not dispute that he was lawfully convicted of second degree murder, which required the State to prove beyond a reasonable doubt that the defendant committed a criminal act that was imminently dangerous to another and demonstrating a depraved mind without regard for human life and this act caused the death of Callahan.
We do agree with the concurring in part and dissenting in part opinion that the completed crime of second degree murder differs from solicitation, conspiracy, and possessory offenses. Each of these crimes becomes a completed crime when the solicitation, conspiracy, or possession occurs. Second degree murder differs in many respects. Procurement, planning, and an overt act or acts that do not cause the death of the victim, do not satisfy the requisite elements of second degree murder. That does not mean, however, that the defendant must possess a firearm during the commission of all of the elements of second degree murder. Section 775.087(1) imposes no such requirement. Section 775.087(1) provides that “whenever a person is charged with a felony ... and during the commission of such felony the defendant carries ... any weapon or firearm ... the felony for which the person is charged shall be reclassified .... ” And as the Merriam-Webster Dictionary clearly concludes — “during” means “at some time in the course of.”' Because the jury found, and the evidence established, that the defendant carried a firearm during his role in the commission of Callahan’s murder, his conviction was properly reclassified under section 775.087(1).
Second degree murder is also a rather unique crime. Most crimes require a specific act or acts to give rise to criminal liability. For example, to commit the crime of robbery, an example relied on in the concurring in part and dissenting in part opinion, the defendant or defendants must take the property from the person or custody of the person with force, violence, assault, or by putting the victim in fear during the course of the taking. § 812.13. Second degree murder does not require a specific act, such as shooting or stabbing the victim. Second degree murder only requires that the defendant commit some act — any act — that is imminently dangerous to another evincing a depraved mind regardless of human life and which ultimately causes the victim’s death. § 782.04(2). The defendant committed such acts, his acts caused the victim’s death, and he was armed with (carried) a firearm during these acts. These findings would have allowed the defendant to be convicted of second degree murder wholly apart from accomplice liability or the principal statute, i.e., the defendant is the “ac *925 tual perpetrator” as well. Thus, his conviction was properly reclassified pursuant to section 775.087(1).
The concurring in part and dissenting in part opinion erroneously relies on Lemus v. State, 33 So.3d 774 (Fla. 4th DCA 2010). In Lemus, the Fourth District Court of Appeal addressed whether under section 775.087(2)(a)2. (the “10/20/Life” statute), the trial court could impose twenty-year minimum mandatory sentences for each of the separate aggravated assaults committed by the defendant based on his discharge of a firearm during his standoff with the police. The Fourth District Court of Appeal correctly held that based on the facts of that case,- the twenty-year minimum mandatory sentences could not be imposed for the aggravated assaults. Id. at 776.
Section 775.087(2)(a)2. provides in pertinent part that any person who is convicted of a qualifying offense (including an aggravated assault) “and during the course of the commission of the felony such person discharged a ‘firearm’ ... shall be sentenced to a minimum term of imprisonment of 20 years.” Although the defendant discharged his firearm during his standoff with the police, because he did not discharge his firearm during the commission of either of the aggravated assaults (when he came outside the house and pointed his firearm at the police), the Fourth District Court of Appeal correctly held that section 775.087(2)(a)2. could not be used to impose twenty-year minimum mandatory sentences for the aggravated assaults. The aggravated assaults were wholly committed when Lemus pointed his weapon at the officers and cause fear. Thus, the entire commission of those aggravated assaults took mere seconds, and the defendant did not discharge a weapon during that time. In the instant case, the defendant may have carried his firearm during other criminal acts, but his second degree murder conviction was reclassified based solely on the firearm the defendant carried during the commission of the murder, and not some other offense. Further, unlike the defendant in Lemus, he carried his weapon while the crime of second degree murder was ongoing.

CONCLUSION

Because the defendant did not timely object to the reclassification of second degree murder based on a defect in the indictment, he must demonstrate fundamental error to obtain a reversal of his conviction and sentence to second degree murder with a firearm. The defect in the indictment was not a failure to charge an element of the crime; the defendant had notice that the State intended to prove that he carried a firearm during his role as a principal to, the murder and that the State would seek a reclassification of the murder charge; the defendant has not claimed surprise or prejudice; and the reclassified second degree murder was not greater in degree or penalty than the charged offense. Therefore, no fundamental error has been shown, and we cannot reverse on that basis.
The jury’s finding was also legally sufficient to permit reclassification of the second degree murder. The defendant specifically requested, and the trial court instructed the jury, that the firearm reclassification of second degree murder was to be treated as an element of second degree murder. Therefore, the jury was instructed that the lesser included offense of first degree murder was second degree murder with a firearm. The jury was instructed that it must find the defendant not guilty unless it concluded that the State proved beyond a reasonable doubt that the defendant carried a firearm when he committed an act or acts that were imminently dangerous to anoth *926 er and evincing a depraved mind regardless of human life, and that these acts caused Callahan’s death. Thus, it cannot be disputed that the jury found that the defendant carried a firearm during the commission of the second degree murder.
Lastly, reclassification under section 775.087(1) does not require use of the weapon that actually killed the victim, the defendant’s physical presence during the last act that resulted in the victim’s death, or that the firearm carried by the defendant be used in furtherance of the crime. Thus, because the reclassification of the defendant’s conviction for second degree murder was based on his personal possession of a firearm during the acts he committed during the commission of the murder — acts that were imminently dangerous and evincing a depraved mind regardless of human life and which caused the death of Callahan — the reclassification of the second degree murder was not fundamental error.
Affirmed.
WELLS, SAJLTER, FERNANDEZ, LOGUE and SCALES, JJ., concur.

. Presently, a prosecution for "a felony that resulted in a death may be commenced at any time.” § 775.15(1), Fla. Stat. (2014).

. Morris and other FBI agents received money and gifts from Bulger and Flemmi while the defendant was still employed by the FBI. The defendant served as an intermediary to deliver the money and gifts to these agents. Morris, who testified at the defendant's trial, admitted that the defendant delivered money and gifts to him from Bulger and Flemmi.

. The elements of second degree murder are: (1) the victim is dead; (2) the death was caused by the criminal act of the defendant; and (3) there was an unlawful killing of the victim "by any act imminently dangerous to another and evincing a depraved mind regardless of human life-" § 782.04(2), Fla. Stat. (1981).

. While the defendant objected at the charge conference to the trial court instructing the jury on conspiracy with a firearm (Count II), he specifically limited his objection regarding reclassification under section 775.087(1) to the conspiracy count:
Defense Counsel: I object to the instruction with a firearm because it is not charged in the indictment. This goes back to an argument that was made a while ago with regard to our motion to dismiss because the statute of limitations has run. If we look at Count 2.
The State: Count 1 or 2?
Defense Counsel: If we look at Count 2, what is charged is a conspiracy to commit the crime of first degree murder with a firearm. What should be charged is armed conspiracy to commit first degree murder with a firearm and the way it is charged it is not the substantive charge of conspiracy is not charged with a firearm [sic]. Therefore, I object to this instruction and renew my motion to dismiss Count 2 because the statute of limitations has run.
The defendant’s only objection to Count I, the homicide count, was his objection to second degree murder as a lesser induced offense because second degree murder was time barred.

. Although the murder occurred in 1982, we cite to section 777.011, Fla. Stat. (2005), as that is the principal instruction that was agreed to by the parties and instructed by the trial court.